**PARK VILLAGE APARTMENTS,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 701–88C.**

United States Court of Federal Claims.

Dec. 21, 1994.

---

William R. Edgar, Piedmont, CA, for plaintiff.

Arnold M. Auerhan, with whom were Asst. Atty. Gen. Frank W. Hunger and David M. Cohen, Director, Washington, DC, for defendant. Howard Schmeltzer and Steve Cerny, Department of Housing and Urban Development, of counsel.

## OPINION

ANDEWELT, Judge.

### I.

In this government contract action, plaintiff, Park Village Apartments, challenges the periodic rent adjustments granted by the United States Department of Housing and Urban Development (HUD) pursuant to Section 1.8 of a Housing Assistance Payments (HAP) contract plaintiff entered with HUD under Section 8 of the United States Housing Act of 1937, as amended, 42 U.S.C. § 1437f (the Housing Act). In a prior opinion, *Park Village Apartments v. United States*, 25 Cl. Ct. 729 (1992) (*Park Village I*), this court interpreted Section 1.8(d) of the HAP contract, entitled "Overall Limitation," as requiring HUD to adjust the HAP contract rents so as to eliminate any material differences between the contract rents and the rents charged for comparable unassisted units. At the subsequent trial on the merits, the parties presented conflicting testimony as to the rents charged for comparable unassisted units during the years in dispute.[1] In its post-trial brief, defendant, *inter alia*, asks this court to reconsider its interpretation of Section 1.8(d) in *Park Village I*.

### II.

Pursuant to its HAP contract with HUD, effective May 24, 1978, plaintiff constructed an 84–unit apartment building for the elderly and disabled. The HAP contract established an initial contract rent of $285 for each unit and HUD agreed to pay plaintiff the difference between the contract rent and the rent plaintiff received from its low-income tenants. Section 1.8 of the HAP contract provided for periodic adjustments to the contract rents, as follows:

1.8 *RENT ADJUSTMENTS*

a. *Funding of Adjustments.* Housing assistance payments will be made in increased amounts commensurate with Contract Rent adjustments under this Section, up to the maximum amount authorized under Section 1.5a of this Contract.

b. *Automatic Annual Adjustments.*

(1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.

(2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

c. *Special Additional Adjustments.* Special additional adjustments shall be granted, when approved by the Government, to reflect increases in the actual and necessary expenses of owning and maintaining the Contract Units which have resulted from substantial general increases in real property taxes, utility

---

1. Plaintiff originally disputed HUD's method of adjusting contract rents beginning in 1979, one year after the parties entered the contract. But in *Park Village I*, 25 Cl.Ct. at 734, this court concluded that plaintiff's claims involving rent adjustments made prior to 1982 are barred by the applicable statute of limitations.

444

rates, or similar costs (i.e., assessments, and utilities not covered by regulated rates), but only if and to the extent that the Owner clearly demonstrates that such general increases have caused increases in the Owner's operating costs which are not adequately compensated for by automatic annual adjustments. The Owner shall submit to the Government financial statements which clearly support the increase.

    d. *Overall Limitation.* Not withstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

    e. *Incorporation of Rent Adjustment.* Any adjustment in Contract Rents shall be incorporated into Exhibit A by a dated addendum to the exhibit establishing the effective date of the adjustment.

Pursuant to Section 1.8(b), for each year up to 1986, HUD granted upward adjustments to plaintiff's contract rents based upon application of the Automatic Annual Adjustment Factors (AAAFs) which are described in 24 C.F.R. pt. 888. In 1986, however, HUD informed plaintiff that to justify any upward adjustment, plaintiff would have to conduct a comparability study to demonstrate that its contract rents did not materially exceed the rents charged for comparable unassisted units. Plaintiff prepared such a study which set comparable rents at between $547 and $584. In response to this study, HUD adjusted the contract rents by applying the applicable AAAFs, which resulted in a contract rent increase to $513.

Plaintiff appealed this 1986 adjustment within HUD and argued that pursuant to the overall limitation provision in the HAP contract, Section 1.8(d), HUD was obliged to rely upon the comparability data and to adjust the contract rents to an amount higher than the rent resulting from application of the AAAFs. In denying plaintiff's appeal, HUD took the position that comparability studies conducted pursuant to the overall limitation can only be used as a basis for adjusting contract rents to an amount less than that which would result from application of the AAAFs, and not for increasing contract rents to an amount above the AAAF level. In other words, HUD took the position that the overall limitation serves only to create a ceiling and not a floor on contract rents. HUD informed plaintiff that the only way plaintiff could receive a rent increase above that resulting from application of the AAAFs would be to apply for a special adjustment under Section 1.8(c) and demonstrate a significant increase in operating costs. Plaintiff pursued a number of appeals regarding the 1986 and subsequent rent adjustments, but HUD's position did not change. Ultimately, plaintiff filed the instant suit. In *Park Village I*, 25 Cl.Ct. at 731, this court rejected HUD's contract interpretation and held that the overall limitation creates both a ceiling and a floor on contract rent adjustments.

### III.

#### A.

■ Defendant asks this court to reconsider the court's interpretation of the overall limitation in *Park Village I* based upon the Supreme Court's discussion of the overall limitation in *Cisneros v. Alpine Ridge Group,* —— U.S. ——, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993). Unlike the instant case, *Alpine Ridge* involved a situation where an upward rent adjustment based on the applicable AAAFs allegedly resulted in too high rather than too low a contract rent compared to the rents charged for comparable unassisted units. The plaintiff therein contended that its HAP contract obliged HUD to grant an upward rent adjustment based upon the applicable AAAFs regardless of the results of any comparability studies, but HUD responded that it could base the adjustment upon comparability studies instead.

This court addressed the identical issue raised in *Alpine Ridge* in *National Leased*

*Housing Ass'n v. United States,* 22 Cl.Ct. 649, 658–59 (1991) (*NLHA I*). In *NLHA I,* this court disagreed with the Court of Appeals for the Ninth Circuit's interpretation of the overall limitation provision enunciated in *Rainier View Associates v. United States,* 848 F.2d 988 (9th Cir.1988), *cert. denied,* 490 U.S. 1066, 109 S.Ct. 2065, 104 L.Ed.2d 630 (1989), and concluded that HUD is not obliged to adjust HAP contract rents based upon the applicable AAAFs when comparability studies show that such an adjustment would result in contract rents that are materially higher than the rents charged for comparable unassisted units. In *Alpine Ridge,* the Supreme Court employed essentially the same reasoning this court employed in *NLHA I* and also rejected the Ninth Circuit's interpretation of the overall limitation enunciated in *Rainier View.* The Supreme Court concluded that "we think that the contract language is plain that no project owner may claim entitlement to formula-based rent adjustments that materially exceed market rents for comparable units." *Alpine Ridge,* —— U.S. at ——, 113 S.Ct. at 1904.

In seeking reconsideration of *Park Village I,* defendant relies upon the following state-

ment in *Alpine Ridge:* "The rent adjustments indicated by the [AAAFs] remain the presumptive adjustment called for under the contract. It is only those presumably exceptional cases where the Secretary has reason to suspect that the adjustment factors are resulting in materially inflated rents that a comparability study would ensue." *Id.* But *Alpine Ridge* focused on "materially inflated rents" because the adjustments based upon the AAAFs in issue therein would result in rents that exceeded comparable rents. The Court in *Alpine Ridge* did not have before it and did not purport to address the instant situation, where application of the AAAFs would produce rents materially below comparable rents.

Moreover, although the Supreme Court did not purport to address the instant situation in *Alpine Ridge,* the Court's application and analysis of the overall limitation tends to support, rather than refute, this court's interpretation in *Park Village I.* In *Alpine Ridge,* the Supreme Court read the overall limitation provision in the HAP contract as implementing Section 8(c)(2)(C) of the Housing Act,[2] and characterized Section 8(c)(2)(C) as follows:

2.  Section 8(c)(2)(C) of the Housing Act provides:
    Adjustments in the maximum rents under subparagraphs (A) and (B) shall not result in material differences between the rents charged for assisted units and unassisted units of similar quality, type, and age in the same market area, as determined by the Secretary. In implementing the limitation established under the preceding sentence, the Secretary shall establish regulations for conducting comparability studies for projects where the Secretary has reason to believe that the application of the formula adjustments under subparagraph (A) would result in such material differences. The Secretary shall conduct such studies upon the request of any owner of any project, or as the Secretary determines to be appropriate by establishing, to the extent practicable, a modified annual adjustment factor for such market area, as the Secretary shall designate, that is geographically smaller than the applicable housing area used for the establishment of the annual adjustment factor under subparagraph (A). The Secretary shall establish such modified annual adjustment factor on the basis of the results of a study conducted by the Secretary of the rents charged, and any change in such rents over the previous year, for assisted units and unassisted units of similar quality, type, and age in the smaller market area. Where the Secretary determines that such

modified annual adjustment factors cannot be established or that such factor when applied to a particular project would result in material differences between the rents charged for assisted units and unassisted units of similar quality, type, and age in the same market area, the Secretary may apply an alternative methodology for conducting comparability studies in order to establish rents that are not materially different from rents charged for comparable unassisted units. If the Secretary or appropriate State agency does not complete and submit to the project owner a comparability study not later than 60 days before the anniversary date of the assistance contract under this section, the automatic annual adjustment factor shall be applied. The Secretary may not reduce the contract rents in effect on or after April 15, 1987, for newly constructed, substantially rehabilitated, or moderately rehabilitated projects assisted under this section (including projects assisted under this section as in effect prior to November 30, 1983), unless the project has been refinanced in a manner that reduces the periodic payments of the owner. Any maximum monthly rent that has been reduced by the Secretary after April 14, 1987, and prior to November 7, 1988, shall be restored to the maximum monthly rent in effect on April 15, 1987. For any project which has

[T]he Housing Act ... provides that "[a]djustments in the maximum rents," whether based on market surveys or on a reasonable formula, "shall not result in material differences" between Section 8 rents and the rents for comparable housing on the private market.

*Alpine Ridge,* —— U.S. at ——, 113 S.Ct. at 1903. This court's interpretation of the overall limitation as applying to AAAF-based adjustments that would produce contract rents materially below comparable rents is consistent with the purpose behind Section 8(c)(2)(C) in that it assures that HUD will eliminate any material differences between Section 8 rents and rents charged for comparable unassisted units.

### B.

Next, defendant argues that this court's interpretation of the overall limitation in *Park Village I* fails to give proper deference to HUD's own interpretation of the provision. Defendant argues that HUD derived the overall limitation in the HAP contract from a similarly worded HUD regulation and that this court must give deference to HUD's interpretation of its own regulations. *Santa Fe Engineers, Inc. v. United States,* 801 F.2d 379, 381 (Fed.Cir.1986); *Honeywell, Inc. v. United States,* 228 Ct.Cl. 591, 596, 661 F.2d 182, 186 (1981).[3] In any event, even if this court is obliged to grant a level of deference to HUD's interpretation of the overall limitation, this court should not defer to HUD's interpretation because that interpretation is not reasonable.

The wording of the mandate in the overall limitation is absolute: "[A]djustments ... shall not result in material differences between the rents charged for assisted and comparable unassisted units...." The overall limitation admittedly does not specify what action HUD must take if AAAF-based

adjustments would result in such material differences, *i.e.,* if HUD must simply refrain from granting the AAAF-based adjustment or, as a second alternative, must grant a different adjustment which would eliminate any material differences. As discussed in *Alpine Ridge* and *NLHA I,* where comparability studies indicate that application of the AAAFs would produce too high a rent, HUD has interpreted the overall limitation according to the second alternative and eliminated the material difference by granting the project owner an appropriate adjustment different than an AAAF-based adjustment. This court agrees with HUD's resort to this interpretation in such a case. The court disagrees, however, with HUD's selection of yet a third option when comparability studies indicate that the grant of an AAAF-based adjustment would result in contract rents that are materially below comparable rents. In such cases, HUD proposes simply to grant the full AAAF-based adjustment notwithstanding the resulting "material difference." The wording of the overall limitation, however, does not authorize HUD to honor the mandate against adjustments resulting in material differences when the mandate works to HUD's advantage and to ignore that mandate when the mandate works to HUD's disadvantage. The same obligation to modify adjustments so as to eliminate material differences applies whether comparable rents are materially higher or materially lower than AAAF-based rents.

Next, to support its position that HUD should be given discretion in applying the overall limitation provision, HUD points to the "as determined by the Government" phrase in the overall limitation. Although that phrase admittedly grants HUD discretion, the determination to which this phrase refers relates to the determination of whether material differences exist between con-

---

had its maximum monthly rents reduced after April 14, 1987, the Secretary shall make assistance payments (from amounts reserved for the original contract) to the owner of such project in an amount equal to the difference between the maximum monthly rents in effect on April 15, 1987, and the reduced maximum monthly rents, multiplied by the number of months that the reduced maximum monthly rents were in effect.

42 U.S.C. § 1437f(c)(2)(C).

3. Ambiguous contract provisions typically are interpreted against the drafter of the contract, here HUD, rather than in the drafter's favor. *S.W. Aircraft, Inc. v. United States,* 213 Ct.Cl. 206, 213, 551 F.2d 1208, 1212 (1977).

tract rents and rents charged for comparable unassisted units. Hence, the overall limitation grants HUD discretion in determining which units are comparable, what rents are charged for those comparable units, and whether AAAF-based adjustments would result in differences between assisted and comparable unassisted rents that are "material." [4] The overall limitation does not, however, grant HUD the discretion to refrain from taking any preventive action in the event HUD determines that an adjustment would result in a material difference. The overall limitation mandates that "adjustments ... *shall not* result in material differences" (emphasis added), and HUD is obliged to comply with that mandate.

## C.

Next, defendant argues that the court's interpretation of the overall limitation is inconsistent with HUD's mission to obtain quality housing for low-income tenants because HUD's mission does not include providing the owners of Section 8 projects with market rents. But HUD's ability to obtain quality housing is related to the amount of guarantee it is willing to provide to project owners. As this court explained in *National Leased Housing Ass'n v. United States*, 32 Fed.Cl. 454, 466 (1994) (*NLHA III*):

> Interpreting the overall limitation and Section 8(c)(2)(C) as expressing an overarching concern that Section 8 rents not be materially different from rents charged for comparable unassisted units would seem consistent with the parties' reasonable economic expectations when they entered the HAP contracts. If the project owners did

not enter HAP contracts with HUD, they could expect to rent their units to tenants on the open market at rents approximating those charged for comparable unassisted units. Similarly, if HUD, without the benefit of the HAP contracts, tried to find apartments for low-income families, HUD could expect to pay approximately market rents. Therefore, interpreting the overall limitation provision to require adjustment of the contract rents in order to eliminate any material difference between the rents charged for assisted and comparable unassisted units would be generally consistent with the reasonable expectations of both HUD and the project owners as to the value of the rented units. HUD and the project owners would both be assured that contract rents would not stray too far from market rents. HUD could expect to pay and the project owners could expect to receive rents not materially different from the rents charged for comparable units on the open market.

Defendant argues that it is not necessary for HUD to guarantee Section 8 project owners rents that are not materially different from rents charged for comparable unassisted units because project owners with HAP contracts are insulated from certain market risks faced by owners of unassisted units, including nonpayment of rent.[5] But the argument that rents charged for comparable unassisted units are too high a benchmark for contract rents in Section 8 units is inconsistent with HUD's procedures for setting contract rents. First, as explained *infra* pp. 450–51, when HUD established the initial contract rents upon entering the HAP contracts, pursuant to its regulations HUD typi-

---

4. Section 1.8(d) provides that "adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, *as determined by the Government*" (emphasis added). This grant of discretion to the government, of course, is not absolute and is not free from court review. "It is a well-established principle of law that a 'party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously.'" *American Export Isbrandtsen Lines, Inc. v. United States*, 204 Ct.Cl. 424, 465, 499 F.2d 552, 576 (1974) (quoting *Pacific Far East Line, Inc. v.*

*United States*, 184 Ct.Cl. 169, 184, 394 F.2d 990, 998 (1968)).

5. To support this contention, defendant cites to the following Federal Register statement:

> A landlord participating in the Section 8 program obtains compensating advantages in payment assurances provided for temporary vacancies, long-term commitments covering increases in costs, and reliability of housing assistance payments backed up by the commitment of the U.S. Government.

40 Fed.Reg. 18,682 (Apr. 29, 1975).

cally set the rents at an amount higher rather than lower than the rents charged for comparable unassisted units. This was in apparent recognition that although entering HAP contracts provides project owners certain economic benefits, conducting business with HUD also entails certain significant economic costs. In addition, when HUD calculated the annual rent adjustments over the years, it did so by application of the AAAFs rather than relying on comparability studies, and the AAAFs are "geared to reflect trends in the local or regional housing market." *Alpine Ridge,* —— U.S. at ——, 113 S.Ct. at 1904. Hence, HUD's consistent approach when establishing contract rents has been to use comparable rents as an appropriate benchmark.

Next, interpreting the overall limitation as addressing situations where the AAAFs produce below-market rents would not have the effect of guaranteeing market rents to project owners. Not all rent differences are addressed by the overall limitation, only "material" differences. As explained above, the phrase "as determined by the Government" grants HUD discretion in determining when a difference in rents is "material." Applying that discretion in situations where AAAF-based adjustments produce above-market rents, HUD has determined that a material difference exists only where the contract rent would exceed comparable rents by 20 percent or more. *See infra* pp. 451–52. Although HUD has not recognized that the overall limitation also applies in situations where AAAF-based adjustments result in below-market rents, assuming that the overall limitation does apply in such situations as this court concluded in *Park Village I,* an analogous definition of material differences would be required. Assuming the same 20 percent threshold is employed where AAAF-based adjustments result in below-market rents, the overall limitation would be triggered only when the rents charged for comparable unassisted units are at least 20 percent higher than the AAAF-based contract rent. A guarantee that contract rents will not trail market rents by more than 20 percent is hardly an absolute guarantee that the project owners will receive market rents. Hence, under this court's interpretation of the over-

all limitation, rent adjustments based on the applicable AAAFs will remain the norm, and reliance on comparability studies will occur only in the extraordinary situation where application of the AAAFs results in rents materially different from market rents.

## IV.

■ The court's next task is to determine whether HUD breached its contractual obligation under the overall limitation when HUD granted the rent adjustments at issue in this case. In establishing the rents charged for comparable unassisted units at the time of these adjustments, the parties rely primarily upon the testimony of real estate appraisers. At trial, defendant offered the testimony of G. Michael Yovino–Young and plaintiff offered the testimony of Catherine Cordini.

Yovino–Young's methodology for determining rents charged for comparable unassisted units was as follows. Yovino–Young collected approximately 4000 entries on one-bedroom apartments during a 15–year period without giving any consideration to the similarities to or differences from plaintiff's 84 units. He used this large database to perform a statistical analysis of the overall trend in rental rates, which he later used as a "reality check" to verify the general correctness of his direct comparisons. Next, Yovino–Young analyzed the top 25 units each year with the highest rental rates to determine a trend for the increase in rates on the highest priced apartments over the 15–year period. From the approximate 4000 entries, Yovino–Young selected 38 units for direct comparison to plaintiff's units, used 3–4 units for each year of his study, and used each unit for no more than 4 years. Each of the units in Yovino–Young's study was an individual apartment that was available for rent in May or June of each year of the study, *i.e.,* a unit that actually was on the market at the time HUD adjusted plaintiff's contract rents.

Yovino–Young then made adjustments to the rents charged for these comparable units to account for differences between these units and plaintiff's 84 units. He made adjustments in nine categories: age (includes

condition of the unit), size, amount of private outdoor space, parking facilities, dishwasher, pool or recreation facilities, utilities, location (both location of the apartment complex and location of the unit within the complex), and amenities for the elderly.

Plaintiff's expert, Cordini, used a different methodology for calculating comparable rents. Cordini compiled a list of approximately 40 apartment complexes by searching newspaper listings, examining government agency listings, and visiting different neighborhoods. She confined her list to those properties that were located in areas comparable to the site of plaintiff's, which is a particularly favorable location for an apartment complex, and to those properties with 50–100 units (which is comparable to plaintiff's 84 units). Cordini eliminated from her list properties for which she could not obtain information and properties significantly older than plaintiff's, which narrowed her list to 10–15 properties. Cordini then selected 4–5 properties based on her "impression" of their comparability to plaintiff's units. She attempted to trace the rents of these properties through the years of her study, and substituted properties only where a significant change in the neighborhood of a property had occurred which would render the property incomparable.

Having selected the comparable units, Cordini, like Yovino–Young, adjusted for differences between the comparable units and plaintiff's units. Cordini, however, adjusted for only five variables: location, condition, size, "unit amenities," and amenities for the elderly. The difference between the comparable rents determined by Yovino–Young and Cordini are as follows:

| Year | Yovino–Young's Conclusions | Cordini's Conclusions |
|------|---------------------------|-----------------------|
| 1982 | $400 | $465 |
| 1983 | 440 | 485 |
| 1984 | 520 | 550 |
| 1985 | 575 | 640 |
| 1986 | 600 | 690 |
| 1987 | 630 | 735 |
| 1988 | 675 | 740 |
| 1989 | 675 | 745 |
| 1990 | 680 | 755 |
| 1991 | 675 | 775 |
| 1992 | 700 | 785 |
| 1993 | 710 | 785 |

This court initially was troubled by the significant differences in design of the two studies and the significant differences in the experts' respective conclusions. As explained by both experts, however, the appraisal business is only part "science" and in large part "art." An expert's "judgment" is often based to some extent on "impressions" which can be characterized as more "art" than "science." Here, each expert relied on his or her own expert judgment when selecting comparable units and adjusting the rents of these comparable units to account for differing conditions.

Plaintiff established that Yovino–Young made certain errors in adjusting for differing conditions such as mistakenly including ad-

450

justments for elevators where none existed in certain of the buildings containing alleged comparable units. Plaintiff also left the court somewhat concerned as to whether Yovino–Young had allowed too small an adjustment for differences in location between plaintiff's property and the alleged comparable units. But these and other discrepancies are comparatively minor and do not demonstrate a significant flaw in Yovino–Young's methodology, application, or results. As to evaluating location, the court is not convinced that Yovino–Young's comparability calculations were subject to any more criticism than Cordini's. Moreover, Yovino–Young's overall methodology had the advantage of including a back-up "reality check" and varying the comparable units over the years, which lessened the effect of any single error on the overall study results. Based on consideration of the testimony of these two experts and plaintiff's other witnesses who testified concerning comparable rents, the court concludes that Yovino–Young's comparability determinations are marginally more convincing and, therefore, the court will adopt the results of Yovino–Young's study.[6]

## V.

■ The next dispute raised in the parties' post-trial briefs involves the proper interpretation of the proviso in the overall limitation in Section 1.8(d), which states: "provided, this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents." The parties dispute (1) the amount of the difference between the contract rent and the rents of charged for comparable unassisted units when HUD established the initial contract rent, and (2) whether in applying the overall limitation this initial difference should be carried forward as a fixed dollar amount or a fixed percentage.

## A.

As to the amount of the initial difference, the HUD handbook in effect at the time the parties entered the instant HAP contract permitted HUD to grant special upward adjustments to comparable rents for Section 8 projects. That version of the handbook allowed the contract rent for elderly/handicapped units to be 15 percent greater than rents charged for comparable unassisted units. The potential 15 percent adjustment consisted of three separate 5 percent adjustments. The first 5 percent adjustment was "to reflect the enhancement in rental values attributable to the special amenities and design features included in Elderly/Handicapped units." The second 5 percent adjustment was "to compensate for the additional burdens of managing an all subsidized rental housing project." The third 5 percent adjustment was to compensate under certain circumstances for the payment of mortgage discounts when HUD-insured financing was used or to compensate for the higher debt service payments generally associated with conventional mortgage loans when conventional mortgage loan financing is used.[7] The

---

6. Because the court finds Yovino–Young's calculations to be more convincing, the court need not address the issues raised in the parties' post-trial briefs as to whether HUD is entitled to deference in its determination as to comparable rents when HUD's determination of comparability is made for the first time in defending a law suit attacking the contract rents rather than at the time HUD determined which method of adjustment to employ.

7. The HUD handbook in effect at the time the parties entered the contract provided, in pertinent part:

    i. *Special Adjustments.* The overall effect of the three adjustments described in subparagraphs (1), (2) and (3) below is to permit the approval of Contract Rents which exceed normal comparability....

(1) An upward adjustment of 5% shall be made to reflect the enhancement in rental values attributable to the special amenities and design features included in Elderly/Handicapped Units. Alternatively, in lieu of a 5% adjustment, the rent of Elderly/Handicapped Dwelling Units may be adjusted by the addition of the monthly amount of the debt service attributable to the inclusion of special amenities and design features for the elderly/handicapped....

(2) If 100% of the revenue-producing dwelling units of a Section 8 project are planned to be assisted, an upward adjustment of 5% shall be made to compensate for the additional burdens of managing an all subsidized rental housing project....

(3) An upward adjustment of 5% shall be made to compensate for the payment of

handbook permitted HUD to grant a contract rent greater than 15 percent above comparable rents if HUD determined the higher resulting rent to be reasonable. The pertinent section of that version of the handbook apparently was modified on May 28, 1978, four days after the parties entered the instant HAP contract. This modified version of the handbook retained the 15 percent adjustment but broke it down into a 10 percent adjustment for an all-assisted, HUD-insured project and a 5 percent adjustment to compensate for mortgage discounts or higher debt service.[8]

HUD set plaintiff's initial contract rent at $285, but the parties disagree as to how many of the three potential 5 percent adjustments HUD granted to produce that $285 figure. The pertinent HUD documents have apparently been destroyed. Plaintiff contends that the $285 figure included all three 5 percent adjustments while defendant contends that, in the absence of the contemporaneous documents, plaintiff can only prove that it received the first two of these adjustments. The third 5 percent adjustment remains in dispute.

At trial, plaintiff presented the testimony of William E. Szymczak, who was the Director of Multi–Family Housing Development in HUD's San Francisco regional office at the time the parties entered the HAP contract. While Szymczak did not specifically recall approving plaintiff's contract, he did testify that it was the custom and practice of his office at the time to grant contractors in plaintiff's situation a full 15 percent upward adjustment based on the three 5 percent adjustments permitted in the HUD handbook. Szymczak did not recall a single exception. This testimony is sufficient to establish that HUD based plaintiff's $285 initial contract rent on a 15 percent upward adjustment to comparable rents. The amount of rent that would yield a $285 initial contract rent after a 15 percent increase is $248. Therefore, comparable rents at the time HUD established plaintiff's initial contract rent were $248 and the difference ·in dollars between comparable rents and the initial contract rent was $37.

### B.

Next, defendant contends that the phrase in the overall limitation proviso "to the extent

---

mortgage discounts when HUD-insured financing is used or to compensate for the higher debt service payments that generally must be paid to obtain conventional mortgage loans when conventional mortgage loan financing is used....

HUD Handbook 7420.1 CHI, ch. 9, at 9–13 to 9–14 (Nov. 1976).

8. The May 1978 handbook provided, in pertinent part:

(9–3i) *Special Adjustments to the Comparable Rent*

(1)(i) The following adjustment is intended to compensate for the increased security services and higher costs of owning and maintaining assisted *family* housing, and for both the additional management costs and costs for additional amenities and design features, such as ramps and grab bars, which are required in units planned for *elderly/handicapped* occupancy.

\* \* \* \* \* \*

(b) For all *assisted units* in HUD-insured projects·in which 100% of the revenue producing units are assisted, a 10% adjustment shall be made.

\* \* \* \* \* \*

(ii) The effect of the use of the appropriate adjustment in paragraph 9–3i(1)(i) is to permit both Contract Rents and rents used in

processing a mortgage insurance application for a Section 8 assisted project to exceed normal comparability (as determined for an unsubsidized mortgage insurance application with no consideration of Section 8 assistance) by 5% or 10% as appropriate.

(2) An upward adjustment of 5% shall be made to compensate for the payment of mortgage discounts when HUD-insured financing is used or to compensate for the higher debt service payments that generally must be paid to obtain conventional mortgage loans when conventional mortgage loan financing is used [unless the conditions below in (i), (ii), and (iii) in the full text of the handbook are satisfied].

\* \* \* \* \* \*

(3) The aggregate potential effect of the special adjustments in paragraphs 9–3i(1) and (2) on the rents is summarized graphically below....

HUD Handbook 7420.1 CHG, ch. 9, at 9–13 to 9–14 (May 1978).

that such differences may have existed with respect to the initial Contract Rents" refers to the $37 initial difference. As a result, according to defendant, in applying the overall limitation, the court is obliged to consider the $37 to be the "extent that such differences may have existed with respect to the initial Contract Rents." Plaintiff argues that the extent of the difference referred to in the proviso is not the dollar difference, but rather the percentage difference between the rents charged for comparable unassisted units and the initial contract rent. This court analyzed this same issue in *NLHA III*, Fed.Cl. at 467–71. For the reasons set forth therein, defendant is correct—the initial difference referred to in the proviso in the overall limitation is a fixed dollar amount, not a percentage factor.

## VI.

■■■ The final issue the court must address is whether plaintiff is entitled to any breach of contract damages as a result of this court's findings and analysis above, including the court's findings as to the rents charged for comparable unassisted units. HUD would be in breach of its obligations under the overall limitation only if there is a "material difference[ ]" between the contract rents HUD established using the AAAFs and the rents charged on the open market for comparable unassisted units. Therefore, the court initially will determine whether the difference in these rents is "material."

As explained above, the phrase "as determined by the Government" in the overall limitation grants HUD the authority to determine whether application of the AAAFs would result in material differences between contract rents and rents charged for comparable unassisted units. This discretion, however, is not absolute. A determination by HUD regarding the "material" nature of a difference in rents is vulnerable to attack in this court if HUD's determination is arbitrary and capricious. *See supra* note 4.

In 1986, HUD first defined "material differences" in the situation where a rent adjustment based on application of the AAAFs would result in a contract rent in excess of comparable rents. HUD took the position

that "a material difference exists whenever the adjusted Section 8 rent would exceed 120 percent times the sum of the comparable rent and the initial difference." At the time, HUD was of the view that the overall limitation did not also reach the situation where a rent adjustment based on application of the AAAFs would result in a contract rent lower than comparable rents. Therefore, HUD did not similarly describe the standard that it would use to assess "material differences" in such situations. After this court concluded in *Park Village I* that the overall limitation applies in situations where AAAF-based contract rents would be lower than comparable rents, HUD took the position that a determination of "material differences" in such situations should be analyzed as the mirror image of HUD's material difference determination where AAAF-based rents would exceed comparable rents.

The court agrees that it is appropriate to employ the same basic analytical approach to detect "material differences" whether AAAF-based contract rents would be above or below comparable rents. As explained above, Section 1.8(d) of the HAP contract embodies the parties' agreement that in both of these situations contract rents will be permitted to stray from comparable rents only to a limited extent. Because the overall limitation uses the same language to cover both situations, it is appropriate to use the same analytic standard to assess "material differences" in both situations. Thus, in effect, when HUD established the standard for assessing a material difference where the AAAF-based adjustment would result in too high a rent, HUD also dictated the standard it should apply when the AAAF-based adjustment would result in too low a rent. Hence, the task before this court is first to determine whether the standard HUD enunciated in 1986 to cover situations where AAAF-based contract rents would exceed comparable rents is sustainable. If it is, then the court will adopt that same analytic approach to determine whether "material differences" exist in this case where AAAF-based contract rents would be below comparable rents.

HUD's adoption of a 20 percent threshold (or a 120 percent factor) in situations where

AAAF-based contract rents would exceed comparable rents admittedly allows for a fairly substantial difference in rents before that difference is held to be "material." For example, the difference between $500 and $600 is 20 percent, and this $100 difference is substantial from the perspectives of both the tenants and the project owners. Upon review, however, HUD's choice of this 20 percent threshold to assess "material differences" is not unreasonable and cannot be characterized as arbitrary and capricious.

Section 1.8 of the HAP contract is directed at accomplishing two goals that are potentially in tension. First, Section 1.8 embodies the parties' agreement that the AAAFs are generally determinative as to the amount of rent adjustments. As the Supreme Court explained in *Alpine Ridge*, "[t]he rent adjustments indicated by the [AAAFs] remain the presumptive adjustment called for under the [HAP] contract." *Alpine Ridge*, —— U.S. at ——, 113 S.Ct. at 1904. Designating the AAAFs as the norm makes economic sense because it would be very costly for HUD to conduct periodic comparability studies on each individual Section 8 unit. Second, Section 1.8 also embodies the parties' agreement that there be some type of comparability "check" on AAAF-based adjustments. As the Supreme Court explained in *Alpine Ridge*, comparability studies will come into play in those "exceptional cases" where the AAAFs do not reflect trends in local markets rents as they were intended to do. *Id.* The concept of comparability creates something of a safety net to assure that contract rents do not depart too dramatically from comparable rents.

In formulating its policy as to what constitutes material differences, HUD had to balance both of these concerns. If HUD had classified small percentage differences in rents as "material," then HUD would be required to base many more adjustments on comparability studies. As a result, HUD's costs would increase significantly and comparability would become an ordinary rather than extraordinary method for calculating Section 8 contract rents. On the other hand, if HUD had limited material differences to very high percentage differences, then the safety net would seldom save. HUD's selection of a 20 percent differential as the minimum threshold for materiality appears to represent a reasonable balance of the competing factors embodied in Section 1.8 of the HAP contracts and hence, a reasonable exercise of the discretion allowed HUD in Section 1.8(d). While this 20 percent threshold assures that the AAAFs ordinarily will control, it also brings comparability into issue where contract rents depart fairly substantially from comparable rents. In this regard, it should be stressed that HUD has an incentive to establish a reasonable threshold for material differences because the threshold can cut both ways. A comparability check on the award of an AAAF-based adjustment helps project owners when the AAAF-based rents trail comparable rents, but helps HUD when the AAAF-based rents exceed comparable rents.

Because the court concludes that a symmetrical approach is appropriate, if the 20 percent differential is employed where AAAF-based contract rents would be too high, then the mirror image approach should be employed where AAAF-based contract rents would be too low. In determining whether AAAF-based rents would be too high, HUD calculates the sum of the comparable rents and the initial difference and then determines whether the AAAF-based rents are higher than 120 percent times that sum. If the AAAF-based rents are higher, then a material difference exists. HUD apparently decided to add the initial difference to the comparable rents before applying the 120 percent factor to adhere to the proviso in the overall limitation that "this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent such differences may have existed with respect to the initial Contract Rents."

Defendant contends that the mirror image approach to be applied where AAAF-based rents are too low should designate a difference as "material" only when the comparable rents exceed the AAAF-based rents by more than 20 percent. Defendant argues that it would be inappropriate to add the initial difference to the comparable rents prior to

applying the 20 percent differential because the initial difference is already factored into the AAAF-based rents, which would be increased if they are "materially" low. It is not necessary, however, for this court to resolve this particular issue because even if the 20 percent factor is applied to the sum of the initial difference and the comparable rents in this case, plaintiff still would not be entitled to recover any damages. The following chart shows that during the years in issue, plaintiff always received contract rents within 20 percent of the sum of comparable rents and the initial difference.

| Year | Yovino–Young's Conclusions Plus Initial Difference ($37) | Material Difference Threshold (−20%) | Actual Rents Paid By HUD |
|------|------|------|------|
| 1982 | $437 | $350 | $372 |
| 1983 | 477 | 382 | 425 |
| 1984 | 557 | 446 | 449 |
| 1985 | 612 | 490 | 494 |
| 1986 | 637 | 510 | 533 |
| 1987 | 667 | 534 | 564 |
| 1988 | 712 | 570 | 606 |
| 1989 | 712 | 570 | 631 |
| 1990 | 717 | 574 | 669 |
| 1991 | 712 | 570 | 698 |
| 1992 | 737 | 590 | 733 |
| 1993 | 747 | 598 | 767 |

Therefore, because plaintiff has failed to establish that "material differences" existed between the contract rents received and the rents charged for comparable unassisted units, plaintiff is not entitled to any breach of contract damages.

### Conclusion

For the reasons set forth above, defendant's motion for reconsideration of *Park Village I* is denied, and the Clerk of the Court shall dismiss plaintiff's complaint. No costs.