JACKSON SQUARE ASSOCIATES, a
New York Limited Partnership,
Plaintiff,

v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOP-
MENT, Buffalo Office–Region II, Defen-
dant.

No. 88–CV–859C.

United States District Court,
W.D. New York.

May 7, 1996.

As Amended May 15, 1996.

John J. Phelan, Buffalo, New York, for
Plaintiff.

Dennis C. Vacco, United States Attorney,
Buffalo, New York (Gail Y. Mitchell, Assis-

tant United States Attorney, of counsel), for Defendant.

CURTIN, District Judge.

On November 8, 1994, the court issued a decision and order granting defendant's motion to dismiss plaintiff's first cause of action alleging a breach of contract. However, the defendant's motion for summary judgment on plaintiff's second cause of action was denied, leaving for determination the question as to whether the United States Department of Housing and Urban Development ("HUD") acted arbitrarily, with an abuse of discretion, and not in accordance with the law in determining that the plaintiff was not entitled to the full rental adjustment requested. The court held that the plaintiff's second cause of action was not barred by the statute of limitations.

After briefing, a second order was issued setting the procedures to be followed in resolving this dispute. The plaintiff argued that if the court found that the administrative record was inadequate, then it should consider affidavits or testimony in reaching a decision as to whether or not the action of the agency was arbitrary. The defendant, however, argued that the court should only look at the record to review the agency's final decision.

After considering the arguments, the court determined that the matter should be returned to the agency to supplement the record if necessary, and to determine whether racial bias played any role in the decision.

The agency has now completed the record by filing the declaration of Kenneth LoBene of the Department of Housing (Item 83). Mr. LoBene's declaration reviews the documents which have been filed in the record and presents an explanation of how the record reached its conclusions. The issues remaining before the court are whether HUD acted correctly in not approving the full rent increase requested by the plaintiff, and whether HUD's decision was tainted by bias on the part of Ronald Lonca, the HUD employee responsible for supervising the Jackson Square project.

The parties have filed briefs, and oral argument was held with the court on April 26, 1996. The following constitutes the court's findings of fact and conclusions of law.

## BACKGROUND

Jackson Square owns a 160–unit low-income housing development in the Town of Amherst, New York. Effective March 13, 1979, it entered into a HAP contract with HUD pursuant to 42 U.S.C. § 1437f, under which HUD agreed to make rental assistance payments to Jackson Square for the development's eligible tenants. Item 83, Ex. A. Under the terms of the HAP contract HUD established unit rents as follows:

| | | |
|---|---|---|
| 40 one-bedroom units | - | $307 per month |
| 60 two-bedroom units | - | $341 per month |
| 50 three-bedroom units | - | $390 per month |
| 10 four-bedroom units | - | $427 per month |

These rents were established based on a review of project income and costs.

At the time HUD processed this project for mortgage insurance under Section 221(d)(4) of the National Housing Act in 1977, HUD estimated that the utility expense for common areas of the project would be approximately $69,000 per year. Item 83, ¶ 8. The plaintiff objected to this estimate, and certified to HUD that operating costs for lighting and miscellaneous power in the common areas (not individual apartments) would be $19,200. *Id.* HUD adopted plaintiff's estimate in its mortgage processing since it was allegedly based on an engineering study. *Id.*

In June 1980, after plaintiff had commenced performance of the project, plaintiff advised HUD that its estimate of the utility expenses had been grossly understated. Item 83, ¶ 9. The actual charge for common-area utilities was $64,297.74 In order to compensate for this shortfall, the plaintiff requested that HUD process a rent increase for the project. *Id.* In support of this application, plaintiff submitted the actual utility bills for the project over the previous twelve months.

HUD's engineering staff reviewed the information submitted by the plaintiff and determined that $64,000 would be a reasonable utility expense. Item 44. The staff conclud-

ed that a budget adjustment of $45,098 would be needed for billing year 1980.

In order to allow plaintiff to carry this increased cost, James Anderson of the Buffalo Area Office of HUD wrote a memo to Conrad Egan, Acting Director, Office of Multifamily Housing Management and Occupancy. Item 83. Ex. E. In the memo, dated July 17, 1990, Anderson provided "an analysis of the needs of this project."

To illustrate the increases the project would require, Anderson included a detailed table in the memo outlining the new rent levels and utility increases his office proposed. For example, for a one-bedroom apartment which rented for $307 per month under the original HAP contract, Anderson proposed two adjustments. The memo first proposes a common area utilities adjustment of $24 per month, bringing the proposed new adjusted contract rent to $331 per month, an increase of 7.8 percent. The memo then proposes a revised tenant's utility allowance of $32 per month, bringing the market rent that Anderson estimated would be required to keep the project solvent at $353 per month, an overall increase of approximately 15 percent.[1]

It is important to note that Anderson's calculation does not include the Automatic Annual Adjustment Factor (AAAF). The HAP contract provides that on each anniversary date of the contract, the contract rents shall be adjusted by applying the AAAF most recently published by the government in the Federal Register. The anniversary date for the Jackson Square project's first year of operation was March 13, 1980, three months prior to the Anderson memo, at which point plaintiff was presumptively entitled to raise the rents by 4.8 percent, pursuant to the latest published AAAF. Item 96, p. 2. Therefore, plaintiff's base rent at the time of the memo should have been approximately $322 ($307 × 1.048 = $322) on that date, and any utility adjustments should have presumably incorporated the adjusted rent.[2]

The anniversary date of the Jackson Square project, on which it was presumptively entitled to the 4.8 percent AAAF, was March 13, 1980. It is unclear whether Anderson understood that the project had recently received its AAAF increase, and if he did, why he didn't change his estimates to include it.

In a memo dated August 29, 1980, HUD Assistant Secretary Lawrence Simons adopted Anderson's proposal and approved the following rent increase schedule:

|  | Original Contract Rent | Original Fair Market Rent | 120% FMR | Adjusted Contract Rent | Approved Contract Rent |
|---|---|---|---|---|---|
| 1BR | $307 | $317 | $380 | $331 | $331 |
| 2BR | $341 | $366 | $439 | $365 | $365 |
| 3BR | $390 | $414 | $497 | $414 | $414 |
| 4BR | $427 | $457 | $548 | $451 | $451 |

Item 83, Ex. F.

The above increase of $24 per unit per month was obviously intended by the Assistant Secretary to simply spread an additional $45,000 per year evenly over Jackson Square's 160 units (24 × 160 = 46,080). As set out more fully below, the calculation of original fair market rent, and 120 percent of fair market rent, are required by statute, as HUD cannot provide rent payment assis-

1. The memo calculates the market rent needed as $363, but this seems to be a simple error in addition.

2. In a memo dated February 19, 1980, Boyd O. Barton, Director, Housing Division, HUD Buffalo Area Office, informed plaintiff that it would receive the 4.8 percent increase effective March 13, 1980. Item 43. In its decision dated November 8, 1994, this court incorrectly stated that this increase was intended to make up the utility shortfall. *Id.*, p. 2. In fact, this increase was the automatic adjustment factor provided for in the contract.

78

tance for units priced more than 20 percent over fair market rent.

The Secretary also stated:

Additionally, the approved contract rent may contain the following utility allowance: 1BR—$34; 2BR—$42; 3BR—$53; 4BR—$64. These rents and utility allowance are based on the original processing error and the need documented in your memorandum.

From the rather simple calculation proposed by Anderson and approved by the Assistant Secretary, however, the situation was complicated somewhat by the HUD Buffalo Area Office.

In a memo dated October 1, 1980, from Boyd O. Barton, Director, Housing Division, Buffalo Area Office, to plaintiff, Barton sets out what the memo characterizes as the final approved rent adjustment. Item 83, Ex. G. The adjustment granted plaintiff the $24 increase approved by the Assistant Secretary, but included in the increase the 4.8 percent automatic annual adjustment factor to which plaintiff was entitled pursuant to the HAP. This resulted in the following modified schedule:

| | Original K Rent | | AAAF (4.8%) | | New K Rate | Approved Rent |
|---|---|---|---|---|---|---|
| 1BR | $307 | × | 1.048 | = | $322 | $331 |
| 2BR | $341 | × | 1.048 | = | $357 | $365 |
| 3BR | $390 | × | 1.048 | = | $409 | $414 |
| 4BR | $427 | × | 1.048 | = | $448 | $451 |

This modification of the Assistant Secretary's approved increase forms the core of the present action. Barton's memo makes no mention of the simple $24 adjustment approved by Simon, nor does it offer any explanation for departing from Anderson's calculation, which did not include the AAAF in the proposed increase. Plaintiff asserts that it was entitled to a $24 increase above the AAAF-adjusted rents, and that subtracting the AAAF from the $24 led to an annual shortfall of $31,550 from the $45,000 annual adjustment which was the stated goal of HUD officers.

It is not clear why Barton didn't simply call plaintiff's attention to Paragraph 1.8c of the HAP contract entered into by the parties, which provides:

*Special Additional Adjustments.* Special additional adjustments shall be granted, when approved by the Government, to reflect increases in the actual and necessary expenses of owning and maintaining the Contract Units which have resulted from substantial general increases in real property taxes, utility rates, or similar costs (i.e., assessments, and utilities not covered by regulated rates), *but only if and to the extent that the Owner clearly demon-strates that such general increases have caused increases in the Owner's operating costs which are not adequately compensated for by automatic annual adjustments.* The Owner shall submit to the Government financial statements which clearly support the increase.

Item 83, Ex. C (emphasis added).

The affidavit of Kenneth LoBene, current Director of the Multifamily Housing Division of the Buffalo Office, acknowledges that the Buffalo office failed to communicate two facts which might have greatly simplified matters: that the AAAF had been recently granted, and that paragraph 1.8c of the HAP contract requires that the AAAF be subtracted from any special adjustment. Specifically, LoBene stated:

It is clear that the rent determination made by HUD's Buffalo Office in this case was based on the language in the HAP contract and Section 8 statute and regulations which provides that special adjustments are only granted to the extent that AAAFs do not adequately compensate the project owner for increased costs. Perhaps the Buffalo Office's memorandum to Conrad Egan should have recited that an AAAF was recently granted to the project.

That may have eliminated the basis for plaintiff's claim that the Buffalo Office failed to implement the rent increase approved by the Assistant Secretary. Item 83, ¶ 15 (footnote and citations omitted).

The rents ultimately approved by HUD in its October 1, 1980, memo represent the following increases over the AAAF-adjusted rents:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1BR—$9 above | the AAAF-adjusted rent | × 40 units | = | $ 360/month |
| 2BR—$8 " | " " " | × 60 units | = | $ 480/month |
| 3BR—$5 " | " " " | × 50 units | = | $ 250/month |
| 4BR—$3 " | " " " | × 10 units | = | $ 30/month |

Total per month increase over AAAF-adjusted rent = $ 1,120/month
Total annual increase over AAAF-adjusted rent = $13,450

---

The complexity of this already complicated problem is compounded by mathematical inconsistencies in the amended complaint. Item 31. In its complaint, plaintiff correctly asserts that Assistant Secretary Simons, in his August 29, 1980 memo, approved a contract rent increase of $24 per unit per month for 160 units, amounting to a total annual payment $46,080. *Id.,* ¶ 8. Plaintiff then, however, states that defendant has paid it $17,280.00 per annum since the final HUD determination. *Id.,* ¶ 12. This number is apparently based on a calculation of the $9 increase for a one-bedroom unit multiplied by 160 units multiplied by 12 months (9 × 160 × 12 = 17,280). But, if HUD adhered to the schedule set out in its October 1, 1980 memo, it has paid plaintiff only $13,450 per year, as outlined above. If HUD has actually paid plaintiff the $17,280 claimed in the amended complaint, then HUD payments have somehow departed from the above schedule.

In a letter dated October 21, 1980, Jeannette Levin, management agent for the Jackson Square project, wrote a letter to Barton complaining about the 1.2 percent raise (over the AAAF adjustment), Jackson Square had received, instead of the 6 percent increase (over the AAAF adjustment) plaintiff had expected. Item 83, Ex. H. In this letter, Ms. Levin suggests that the reason for the low increase was some unspecified bias on

the part of Messrs. Meyer and Lonca, then employed in the Buffalo office of HUD.

Barton answered Ms. Levin's complaint in a letter dated November 5, 1980. Item I. Barton stated:

On March 13, 1980, your contract rents were adjusted 4.8%, the annual adjustment factor. You indicated you needed an additional increase to compensate for increased utility costs due to increased consumption. The documentation for this increase was reviewed and it was determined that an additional $45,000 was required. This was recommended to our Washington Office and they approved an additional 2.8% increase to compensate for the increased utility consumption. The combination of these two increases represents a 7.6% increase in the unit rent but require only a 6% increase in the Housing Assistance Payment Contract.

Item 83, Ex. I. Barton offered no explanation of the confusing final sentence of this paragraph. In fact, plaintiff did get an approximate 7.6 percent overall increase over the original contract rent ($307 × 1.076 = $330.33). But the Washington office did not specifically approve a 2.8 percent increase. The Assistant Secretary approved a $24 per unit increase to generate $45,000 in revenue, not including the AAAF. The 2.8 percent figure is the increase from the AAAF-adjusted rent of $322 to the approved rent of $331 for a one-bedroom apartment, that was im-

plemented by the local office. It is worth noting that in fact, the percentage increases for larger apartments were significantly smaller than 2.8 percent.

Even more confusing is Barton's repeated failure to bring paragraph 1.8c of the HAP contract to plaintiff's attention.

Following HUD's unsatisfying response, plaintiff began a correspondence with various HUD officials that would last for the next eight years. In February 1988, then-counsel for plaintiff advised HUD that it had obtained a 1980 HUD memo, through a Freedom of Information Act request, which discussed proposed rent increases. Plaintiff observed correctly that if the increase approved in Assistant Secretary Simons' memo had been granted, the increase would have been $24.00 per unit, instead of the $7 actually granted. Item 44. The $7 increase referred to represents the average per unit per month increase across all units.

HUD answered that it saw no inconsistencies in the record, that the approved increases granted plaintiff were valid, and that in any event it had no obligation to "provide for" the increases. Item 83, Ex. N.

In an order dated November 8, 1994, this court granted partial summary judgment to HUD, stating that "[t]he sole question to be determined in this lawsuit is whether HUD acted arbitrarily, capriciously, with abuse of discretion, or not in accordance with the law in determining that [plaintiff] Jackson Square was not entitled to the full rental adjustment requested." Item 71, p. 24.

In an order dated January 24, 1995, the court also ordered the case remanded to HUD to more fully explain to the court what procedure was followed in making its decision and what materials were considered. The court also ordered the agency to conduct an investigation into whether the decision-making process was tainted by bias on the part of Ronald Lonca, who was the HUD employee responsible for the supervision of the Jackson Square project. Item 79, p. 4.

Plaintiff now moves for summary judgment, arguing that Secretary Simons' memo represented the final determination of the agency, and that the Buffalo Office was bound by the Secretary's decision. Item 85.

Defendant cross-moves for summary judgment arguing that the statutory authority requires only that HUD make a rational decision, and that the decision of the Buffalo Office was not only rational, but was required by paragraph 1.8c of the HAP contract. Item 91.

## DISCUSSION

### I. Secretary Simons' memo was not the final determination of the agency.

■ 42 U.S.C. § 1437f(c)(1) provides that the maximum monthly rent for which government assistance payments will be paid cannot exceed by more than 10 percent the fair market rent approved by the Secretary, except that the rent may exceed the fair market rent by more than 10 percent, but not more than 20 percent, where the Secretary determines that "special circumstances" warrant the higher rent.

24 C.F.R. § 880.204, as worded in 1980, provided:

(b) Limitation on contract rents. The contract rents for a project through cost certification at completion must be within both of the following limitations:

(1) Fair market rent. The contract rent plus any utility allowance for the unit must not exceed the Fair Market Rent in effect at the time of processing. The published Fair Market Rents will reflect a trended rent in order to allow for the period of construction as stated in the publication ... The contract rent plus utility allowance may exceed the applicable Fair Market Rent under special circumstances or if needed to implement a local Housing Assistance Plan:

(i) By up to 10 percent with the approval of the HUD field office manager, or (ii) By up to 20 percent with the approval of the HUD Assistant Secretary for Housing....

Plaintiff argues that these statutes read together require that maximum rents must be set by the Assistant Secretary of HUD for Housing. Item 85, p. 3. According to plaintiff, the Buffalo Office had no authority to

depart from the rents set by Assistant Secretary Simons, because his determination was the final decision of the agency. Plaintiff further argues that "[i]t is conceded that the HUD decision requested in the Anderson memorandum to the Washington office could only be made by the Asst. Secretary for Housing." *Id.*, citing Item 83, Ex. E.

In examining plaintiff's argument, the court first points out that defendant never conceded that the decision as to maximum rents could only be made by the Assistant Secretary. Instead, officers of the HUD Buffalo Office stated that to approve a maximum rent that exceeded fair market rents by more than 10 percent, they would need the approval of "Washington," presumably meaning the Assistant Secretary. It is important to note that the defendant's position is that while the Assistant Secretary had to approve the rent increase, the Buffalo Office had discretion to set rent levels under the approved maximum. Item 91, p. 12. HUD has never conceded that the local office was required to grant the maximum level approved by the Assistant Secretary.

Furthermore, the court finds no support in the relevant statutes, quoted above, for a requirement that only the Assistant Secretary could make the decision in question. Instead, the statutes quoted above require only that rent increases above 10 percent be approved by the Assistant Secretary for Housing. Nothing in the statute prohibits regional officers from departing from the maximum approved levels.

Plaintiff then argues that the Supreme Court has held that "the Secretary's decision is a final informal agency adjudication." Item 96, p. 2. In support of this proposition, plaintiff first cites a series of cases it refers to lyrically as the *Morgan* Quartet. In *Morgan v. United States*, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936) (hereinafter *Morgan I* ), the Court held that in a quasi-judicial proceeding requiring the taking of evidence, determinations of findings, and orders supporting such findings, the hearing officer must be the one who makes the ultimate decision. The matter may not be delegated to one who had not heard the evidence. *Morgan I,* 298 U.S. at 480–81, 56 S.Ct. at

911–12. The Court noted that the type of proceeding it contemplated was "not one of ordinary administration, conformable to the standards governing duties of a purely executive character. It is a proceeding looking to legislative action. . . ." *Id.* at 479, 56 S.Ct. at 911. This court finds that the process of rate-setting at issue in the present case is exactly the type the *Morgan I* Court intended to exclude from its analysis. The determination of maximum rent levels is a duty of "ordinary administration." Pursuant to the statute, HUD officers have the authority to establish fair market rents, and to set rent increases up to 120 percent of those rents in cases of need. The section of the statute authorizing the rent-setting calls for no formal process, and instead calls for a "purely executive" type of decisionmaking.

Plaintiff then cites the decision of the Second Circuit in *KFC National Management Corp. v. NLRB,* 497 F.2d 298 (2d Cir.1974), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 879, 47 L.Ed.2d 98 (1976), for the same proposition. The *KFC* court followed the *Morgan* analysis, and held that where the relevant statute made it clear that a decision was to be made by the National Labor Relations Board, the members of the Board could not delegate the decision to their staff members. *Id.* at 302.

The main distinction between the *KFC* holding and the present case is the clarity of the statutory language. As stated, there is nothing in either of the statutes quoted above requiring that the Assistant Secretary make any decision, other than to approve proposed increases over 110 percent of fair market rents.

Absent such clear language requiring that a decision be made by a particular person, the Second Circuit has clearly stated that " 'an agency's construction of its own regulations is entitled to substantial deference.' Or, the mere existence of 'more equitable' alternatives 'does not render the Secretary's choice invalid.' " *State of New York v. Lyng,* 829 F.2d 346, 349–50 (2d Cir.1987).

Moreover, the language of the Assistant Secretary himself seems to contemplate that his approval was just one interim part of the HUD decisionmaking process. In his August

29 memo, Assistant Secretary Simons approved a contract rent increase of $331. He then stated, "[a]dditionally, the approved contract rent *may* contain the following utility allowance . . . ." Item 83, Ex. F (emphasis added). This language suggests strongly that the Buffalo Office had the authority to adjust rents within the maximum levels approved by the Assistant Secretary.

Consequently, this court concludes that the decision of the Buffalo Area Office was the final HUD determination, and that the Buffalo Area Office had the authority to depart from the approved maximum levels outlined in the Assistant Secretary's memo of August 29, 1980, provided its determination was not arbitrary and capricious.

## II. The decision of the Buffalo Area Office was neither arbitrary nor capricious.

■ Defendant argues that the determination of the Buffalo Office was based on the plain language of paragraph 1.8c of the HAP contract, which provides that special adjustments are only provided to the extent that the AAAF's do not adequately compensate the project owner for increased costs. Defendant argues that its decision to include the AAAF in the proposed increase was rational. Item 91, p. 12.

Plaintiff counters that the "conduct of agency staff of subtracting the AAAF from the Jackson Square approved contract rent cancelled out the statutory AAAF of 1.048 that plaintiff had received on March 13, 1980." Item 96, p. 3.

In support of its main argument, plaintiff argues that the AAAF benefit is a presumptive right to which a property owner is entitled as a party to a HAP contract, unless HUD has carried out a compatibility study which established that the adjusted rate exceeded comparable unassisted rents. Plaintiff cites *Cisneros v. Alpine Ridge Group,* 508 U.S. 10, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993) in support of this proposition.

This court notes as an initial matter that the *Cisneros* decision does not hold that the AAAF payment is a presumptive right. Instead, the Court noted that AAAFs remain

the "presumptive adjustment" called for under the HAP contract. *Id.* at 19–21, 113 S.Ct. at 1904.

However, even assuming the *Cisneros* decision could be construed as plaintiff maintains, there is nothing in that construction inconsistent with paragraph 1.8c of the HAP contract. Paragraph 1.8c simply states that the AAAF must be calculated into any requested special additional adjustments. This requirement is in no way inconsistent with the proposition that the AAAF is a presumptive right.

This court therefore concludes that the decision of the Buffalo Office, although it could have been far more plainly explained to plaintiff, was a reasonable decision within the statutory discretion granted the agency.

## III. Allegations of bias on the part of HUD staff member Ronald Lonca.

■ Plaintiff offers the deposition of George Roberts, formerly a loan specialist in the HUD Buffalo Office, as evidence that Ronald Lonca, the HUD officer in charge of the Jackson Square project, harbored a bias against Frank Levin, president of Jackson Square, because Levin was Jewish, and that Lonca deducted the AAAF from the rent adjustment because of that bias. Item 96, p. 9; Item 96 Ex. 5.

Given the finding of this court that the action of the HUD Buffalo office was proper, any alleged bias on the part of Lonca is irrelevant to this action. Even assuming, *arguendo,* that Lonca was biased against the plaintiff, and deducted the AAAF from the rent adjustment due to that bias, the AAAF deduction was not only proper, but was required by paragraph 1.8c of the HAP contract. The court does not, therefore, see how plaintiff could show that he was in any way injured by Lonca's alleged bias.

## CONCLUSION

For the above reasons, plaintiff's motion for summary judgment is denied and defendant's cross-motion for summary judgment is

granted. Plaintiff's action is dismissed as to all claims.

So ordered.