# Legality of Fixed-Price Intergovernmental Agreements for Detention Services

The Department of Justice has authority to enter Intergovernmental Agreements with state or local governments to provide for the detention of federal prisoners and detainees on a fixed-price basis and is not limited to providing compensation for costs under such agreements.

December 31, 2002

MEMORANDUM OPINION FOR THE DEPUTY ATTORNEY GENERAL

Your Office has asked us to advise whether the Department of Justice ("Department"), in entering into so-called Intergovernmental Agreements, or IGAs, under which state or local governments provide for the detention of federal detainees, may agree to a fixed price for detention services. For the reasons set forth below, we conclude that the Department may do so.

## I.

The U.S. Marshals Service ("USMS") and the Immigration and Naturalization Service ("INS") frequently enter into IGAs with state and local governments for the detention of persons in connection with federal criminal and immigration proceedings. These IGAs have typically set compensation for these services at the cost actually incurred by the provider, as determined pursuant to OMB Circular A-87, Cost Principles for State, Local, and Indian Tribal Governments (rev. May 4, 1995, as further amended Aug. 29, 1997). The Department's Office of the Detention Trustee, which is responsible for directing USMS and INS on detention operations, Pub. L. 106-553, app. B, 114 Stat. 2762A-52 (2000), recommends that the Department consider using fixed-price IGAs in the future in certain circumstances. Under a fixed-price arrangement, the price for detention services would not be based solely on the provider's costs and would not be subject to ongoing or retroactive adjustment to reflect costs actually incurred. Instead, the price would be set at a fair and reasonable level at the time the IGA was executed. This fixed price might be above or below the provider's expected or actual costs.

The Department's Office of the Inspector General ("OIG") maintains that the Department lacks legal authority to enter into fixed-price IGAs for detention services. It argues both that the Department has no statutory authority to enter into such agreements and that such agreements violate OMB Circular A-87.[1]

---

[1] *See* Memorandum for the Deputy Attorney General, from Glenn A. Fine, Inspector General, *Re: Procurement of Detention Services* (March 12, 2002) ("OIG Memorandum I"); Memorandum for Larry D. Thompson, Deputy Attorney General, from Glenn A. Fine, Inspector General, *Re: OIG Comments on August 1, 2002 Memorandum from Federal Detention Trustee* (Sept. 18, 2002) ("OIG Memorandum II").

## II.

We first consider whether the Department has statutory authority to enter into fixed-price detention IGAs. Section 119 of Public Law 106-553 provides:

> *Notwithstanding any other provision of law*, including section 4(d) of the Service Contract Act of 1965 (41 U.S.C. 353(d)), the Attorney General *hereafter* may enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, *on any reasonable basis*.

114 Stat. 2762A-69 (2000) (emphasis added).

Although Public Law 106-553 was an annual appropriations act, section 119 is clearly earmarked as permanent legislation by its use of the term "hereafter," a term that is regularly used by Congress to specify that particular sections of an appropriations act constitute permanent legislation. *See, e.g.*, *United States v. Vulte*, 233 U.S. 509, 514-15 (1914); *Cella v. United States*, 208 F.2d 783, 790 (7th Cir.1953) ("The use of the word 'hereafter' by Congress as a method of making legislation permanent is a well-known practice."); *Permanency of Limitation on Interstate Commerce Commission's Approval of Railroad Branchline Abandonments Contained in 1982 Appropriation Act*, 70 Comp. Gen. 351, 353 (1991).

## A.

Section 119 grants the Attorney General permanent authority to enter into contracts "of any reasonable duration" for the use of detention facilities and related services "on any reasonable basis." The concluding phrase "on any reasonable basis," interpreted within the ordinary meaning of those terms, appears to encompass all pertinent terms (including price terms) that would be reasonable to include in an agreement of the kind described. Because a fixed-price term is plainly reasonable, section 119 therefore appears to confer authority on the Attorney General to enter into fixed-price detention IGAs.

OIG disputes this interpretation. Relying on its understanding of the legislative history of section 119, OIG argues that the phrase "on any reasonable basis" is "shorthand" for a phrase—"to acquire such space or facilities on a lease-to-ownership, lease-with-option to purchase, or other reasonable basis"—that OIG says was proposed by the Department as substitute language for an earlier version of what became section 119. *See* OIG Memorandum II, *supra* note 1, at 4 & attach. F. OIG further states: "There is no suggestion in any of the Department's communications [to Congress] that the Department sought this provision for the purpose of entering into . . . agreements with state and local governments on a basis other than cost." *Id.* at 4.

Initially, we question whether resort to legislative history is appropriate to determine the meaning of the phrase "on any reasonable basis." As a general proposition, resort to legislative history is inappropriate when the terms of a statute are unambiguous. *See, e.g.*, *Barnhill v. Johnson*, 503 U.S. 393, 401 (1992). In context, we believe that the ordinary, and only natural, reading of the phrase "on any reasonable basis" is that it encompasses all the terms and provisions, including price, that ordinarily make up a contract.

But even if we were to entertain legislative history, the Department proposals recounted by OIG in support of its interpretation of the phrase "on any reasonable basis" do not constitute reliable evidence of Congress's intent in enacting section 119. Even on the assumption that the Department communicated such proposals to congressional staff, there is no reliable indication that these proposals were actually communicated to, or seen by, any Members of Congress, let alone the responsible committee chairmen, floor managers, or members of the Conference Committee. Nor is there any indication in the Conference Report on Public Law 106-553 that the Department proposals in question were considered by, or had any influence upon, the Conference Committee which introduced and adopted the language of section 119. Consequently, it is highly doubtful that the Department proposals recounted by OIG even qualify as legislative history. *Cf. Gustafson v. Alloyd Co.*, 513 U.S. 561, 579 (1995) ("Material not available to the lawmakers is not considered, in the normal course, to be legislative history."); *id*. at 580 ("If legislative history is to be considered, it is preferable to consult the documents prepared by Congress when deliberating.")

In any event, even if the proposals in question could be viewed as legislative history, the contents of an executive department's communications proposing statutory language narrower than that which Congress enacted simply do not provide evidence that Congress intended the narrower objective sought by that executive department. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 390 (2000) (Scalia, J., concurring) ("Executive statements and letters addressed to congressional committees" do not provide "a reliable indication of what a majority of both Houses of Congress intended when they voted for the statute before us."). If anything, they tend to support the view that Congress *deliberately* chose the broader language that was in fact enacted, because a specific proposal for a narrower provision was demonstrably available and yet rejected. While the materials cited by OIG may establish the *executive department's* intent in proposing legislation, they fail to provide reliable evidence of *Congress's* intent in enacting legislation that is different from what the executive department proposed.

Thus, we disagree with OIG's contention that the broad phrase "on any reasonable basis" should be construed as "shorthand for the term 'to acquire such space of facilities on a lease-to-ownership, lease-with-option to purchase, or other reasonable basis.'" OIG Memorandum II, *supra* note 1, at 4. We cannot read this ordinary phrase to carry this coded meaning. If Congress somehow intended such

meaning (and we see no reason to think that it did), it was obligated to say so.[2] We instead conclude that the phrase "on any reasonable basis" has its ordinary meaning and that section 119 therefore authorizes the Attorney General to enter into fixed-price detention IGAs.

### B.

Having determined that section 119 gives the Attorney General the authority to enter into fixed-price IGAs for detention services, we next must consider how broad that authority is. In particular, we must explore whether there are other statutes that, by their terms, would prohibit the Attorney General from entering into such fixed-price agreements, and, if so, whether section 119 overrides them.

The obvious starting point for analyzing the interaction of section 119 and any seemingly conflicting statute is section 119's opening phrase, "[n]otwithstanding any other provision of law." As the Supreme Court has noted, "the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993). In certain circumstances, there may be some question about the extent to which Congress actually intended to override other statutes. *See, e.g.*, *Oregon Natural Res. Council v. Thomas*, 92 F.3d 792, 796 (9th Cir. 1996) ("the phrase 'notwithstanding any other law' is not always construed literally"). In general, however, a "notwithstanding" phrase works in tandem with the substantive reach of the section to which it is attached. (That is simply another way of determining which provisions are actually "conflicting." *Cisneros*, 508 U.S. at 18.) Thus, a statute that grants prosecutorial powers "notwithstanding any other provision of law" will be read to "mean[] that the conferral of prosecutorial powers should not be limited by other statutes." *United States v. Fernandez*, 887 F.2d 465, 468 (4th Cir. 1989). And a statute that limits liability "notwithstanding any other provision of law" will be read to "mean[] that the remedies established by the [statute] are not to be modified by any preexisting law." *In re Oswego Barge Corp.*, 664 F.2d 327, 340 (2d Cir. 1981); *see also Mapoy v. Carroll*, 185 F.3d 224, 229 (4th Cir. 1999)

---

[2] The Supreme Court's observations in *Gemsco, Inc. v. Walling*, 324 U.S. 244, 260 (1945), have force here as well:

> The argument from the legislative history undertakes, in effect, to contradict the terms of Section 8(f) by negative inferences drawn from inconclusive events occurring in the course of consideration of the various and widely differing bills which finally, by compromise and adjustment between the two Houses of Congress, emerged from the conference as the Act. The plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction.

(statute that strips jurisdiction "notwithstanding any other provision of law" means "that all other jurisdiction-granting statutes . . . shall be of no effect.").

In the case of section 119, the substance of the provision deals with the Attorney General's authority to enter into contracts for detention services. Therefore, other legal provisions dealing with that subject, to the extent that they conflict with section 119, are overridden by its "notwithstanding" phrase.

We illustrate the effect of section 119 by addressing various other statutes that concern the Attorney General's authority to enter into agreements for detention services.

### 1.

Under 18 U.S.C. § 4002 (enacted in 1948), the Attorney General is authorized to contract with state or local governments, for "a period not exceeding three years," for the "imprisonment, subsistence, care, and proper employment" of "all persons held under authority of any enactment of Congress." With regard to permissible payments under such contracts, section 4002 provides:

> The rates to be paid for the care and custody of said persons shall take into consideration the character of the quarters furnished, sanitary conditions, and quality of subsistence and may be such as will permit and encourage the proper authorities to provide reasonably decent, sanitary, and healthful quarters and subsistence for such persons.

*Id*. This language does not prohibit rates of payment for detention facilities or services that are fixed without respect to cost (or that otherwise might be in excess of cost). Indeed, the closing provision that the rates "may be such as will permit and encourage" the pertinent state or local authorities to provide the kind of decent quarters and subsistence described appears to contemplate and authorize rates that could exceed mere costs in order to bring about the desired conditions.

We note further that insofar as the "reasonable duration" of a detention services agreement may exceed the three-year limit under section 4002, section 119 overrides that three-year limit.

### 2.

Under 18 U.S.C. § 4006 (enacted in 1948), the Attorney General "shall allow and pay only the reasonable and actual cost of the subsistence of prisoners in the custody of any marshal of the United States."

We first note the limited scope of this provision. It applies only to the subsistence of federal detainees who are *in the custody of U.S. marshals*, such as persons in custody awaiting trial, execution of sentence, or extradition. It therefore does

not apply, for example, to detention agreements covering convicted federal offenders serving sentences in prison (who are in BOP custody) or INS detainees awaiting removal or deportation.[3]

The Department's Justice Management Division ("JMD") addressed the effect of section 4006 in 1998 (i.e., before the enactment of section 119 of Public Law 106-553 in 2000). *See* Memorandum for Janis Sposato, Deputy Assistant Attorney General, Justice Management Division, from Stuart Frisch, General Counsel, Justice Management Division, *Re: USMS Agreements and Contracts for Detention and Subsistence Under 18 U.S.C. § 4006* (Apr. 21, 1998) ("JMD Memorandum"). JMD considered whether section 4006 limits the USMS to "cost reimbursement" contracting for detainees' subsistence or whether it permits other types of contract arrangements, such as fixed-price contracts. JMD concluded that section 4006 does not limit the USMS to cost-reimbursement arrangements. JMD Memorandum at 1. JMD primarily based its conclusion on its interpretation of the undefined term "actual cost" in section 4006. Specifically, JMD determined that the term "actual cost" could have any of three meanings: "the actual price charged for the goods and/or services, the actual cost to the provider of producing such goods or services, or the actual selling price after mark-up." *Id*. at 3.

We need not determine whether we agree with JMD's interpretation of "actual cost" because we conclude that, insofar as section 4006 would restrict USMS detainee subsistence agreements to "cost-basis" contracts, that restriction does not survive the enactment of section 119. Section 4006 by its terms provides that any agreement that the Attorney General reaches with state or local governments for the subsistence of federal detainees in USMS custody must limit payment to the "reasonable and actual cost of the subsistence." Unless the flexible interpretation of "actual cost" applied by JMD in its 1998 opinion is adopted, the "actual cost" restrictions of section 4006 would conflict with, and therefore would be overridden by, the Attorney General's authority under section 119 to contract for detention services "on any reasonable basis," "[n]otwithstanding any other provision of law."

**3.**

Under 18 U.S.C. § 4013 (enacted in 1988), the Attorney General is further authorized to make payments from appropriated funds in support of federal

---

[3] See 28 C.F.R. § 0.111(k), which provides that the responsibilities of the U.S. Marshals Service include:

> (k) Sustention of custody of Federal prisoners from the time of their arrest by a marshal or their remand to a marshal by the court, until the prisoner is committed by order of the court to the custody of the Attorney General for the service of sentence, otherwise released from custody by the court, or returned to the custody of the U.S. Parole Commission or the Bureau of Prisons.

prisoners in non-federal institutions. Subsection (a)(4)(C) of this section, which concerns contracts or cooperative agreements with state or local governments regarding the construction or renovation of facilities for detention services, specifies that "the per diem rate charged for housing such Federal prisoners shall not exceed the allowable costs *or other conditions* specified in the contract or cooperative agreement." *Id*. § 4013(a)(4)(C) (emphasis added). This provision expressly recognizes that "other conditions" specified in the contract or cooperative agreement may permit the payment of per diem rates exceeding costs. Those conditions, for example, might include provisions for payment on the basis of a fixed price that is not co-extensive with cost. We therefore do not believe that section 4013 is in conflict with section 119.

## 4.

Under 8 U.S.C. § 1103(a)(11) (amended by the Homeland Security Act of 2002, Pub. L. 107-296, § 1102, 116 Stat. 2135 (2002)), the Attorney General is authorized to (1) make payments from immigration appropriations "for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of" INS detainees under an agreement with a state or local governments; and (2) enter into a cooperative agreement with a state or local government for the provision of acceptable conditions of confinement and detention services for INS detainees for whom that state or local government agrees to provide guaranteed bed space. Nothing in this section prohibits the Department from contracting or paying for detention facilities or services provided by State or local governments on a fixed-price basis. This section therefore does not conflict with section 119.

## C.

We therefore conclude that section 119 confers authority on the Attorney General to enter into fixed-price IGAs with state and local governments for the detention of federal detainees.

## III.

OIG also argues that OMB Circular A-87 prohibits the Attorney General from including in detention IGAs a price provision that is based on terms other than cost. OIG Memorandum I, at 6-8. OMB Circular A-87 provides in relevant part:

> This circular establishes principles and standards to provide a uniform approach for determining costs and to promote effective program deliver, efficiency, and better relationships between governmental units and the Federal Government. The principles are for determining allowable costs only. They are not intended to identify

the circumstances or dictate the extent of Federal and governmental unit participation in the financing of a particular Federal award. *Provision for profit or other increment above cost is outside the scope of this Circular*.

OMB Circular A-87, ¶ 5 (emphasis added). OIG evidently reads the Circular's statement that "[p]rovision for profit or other increment above cost is outside the scope of this Circular" to mean that such provision would violate the Circular.

The Office of Management and Budget ("OMB") itself has repudiated OIG's reading of OMB Circular A-87. As OMB explained to OIG:

> It is our understanding that DOJ uses inter-governmental service agreements (IGAs) to acquire detention space from State and local governments. DOJ's General Counsel, the Marshals Service, and the Immigration and Naturalization Service have determined that some of the IGAs with certain States are fixed-price contracts, rather than cost-reimbursement contracts. *As such these fixed-price IGAs are not covered under OMB Circular A-87*.

Letter for Glenn A. Fine, Inspector General, U.S. Department of Justice, from Joseph L. Kull, Deputy Controller, Office of Management and Budget (Aug. 22, 2002) (emphasis added). OMB's view comports with the most natural reading of OMB Circular A-87: it merely governs *how* properly to determine applicable costs, not *whether* a government contract may authorize payments on a basis *other than* costs. We therefore conclude that OMB Circular A-87 does not prohibit fixed-price detention IGAs.

M. EDWARD WHELAN III
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*
