**OCEAN VIEW TOWERS ASSOCIATES, LIMITED PARTNERSHIP,**
Plaintiff,

v.

**UNITED STATES, Defendant.**

**No. 09–48C.**

United States Court of Federal Claims.

July 15, 2009.

Fred J. Livingstone, Taft Stettinius & Hollister LLP, Cleveland, OH, for plaintiffs. With him on the briefs were Mark J. Valponi and Majeed G. Makhlouf, Taft Stettinius & Hollister LLP, Cleveland, OH.

Cameron Cohick, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Tony West, Assistant Attorney General, Civil Division, and Jeanne E. Davidson, Director, and Alan J. Lo Re, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This breach of contract case arises from a Housing Assistance Payment Contract ("HAP Contract") entered between Ocean View Towers Associates, Limited Partnership ("Ocean View") and the United States Department of Housing and Urban Development ("HUD"), pursuant to the "Section 8" Housing Program. Compl. ¶ 5. Ocean View filed a complaint on January 23, 2009 seeking damages from and against the United States for an alleged breach of this HAP Contract. Compl. ¶ 1. The HAP Contract provides for owners of the Ocean Pointe Towers Apartments to receive periodic increases to the contract rents of the pertinent apartment units. Compl., Ex. A (Ocean View HAP Contract) ("HAP Contract") § 1.8(b). Ocean View bases its claims on HUD's alleged failure to provide "automatic annual rent increases or appropriate such increases" as specified in the HAP Contract beginning in the contract anniversary year of 2002 and continuing through the date its complaint was filed. Compl. ¶¶ 1, 19.[1] The claims in this action relate to the anniversary year of 2002 and the succeeding years for the Ocean Pointe project. Compl. ¶ 1.

Pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims, the government has moved to dismiss a portion of Ocean View's claims arising in 2003 based upon the six-year statute of limitations applicable to claims brought under the Tucker Act, 28 U.S.C. § 1491(a). Def.'s Mot. to Dismiss, in Part ("Def.'s Mot.") at 1 (citing the statute of limitations, 28 U.S.C. § 2501). The complaint was filed on January 23, 2009, and the government contends that Ocean View's claims from January 23, 2003 through September 2, 2003 are barred, asserting that those claims accrued on the anniversary date of the 2002 contract year, September 3, 2002, which is more than six years from the date

---

1. The term "contract anniversary year" represents the year beginning on the contract's anniversary date of September 3 and ending September 2 of the following year. Thus, the 2002 contract year began on the contract anniversary date of September 3, 2002 and ended on September 2, 2003.

the complaint was filed. Def.'s Mot. at 1. Conversely, Ocean View avers that its claims for payments from January 23, 2003 to September 2, 2003 fall within the statute of limitations because HUD was permitted to adjust the contract rents at any time during the anniversary year, not solely on the anniversary date. Pl.'s Resp. to Def.'s Mot. to Dismiss ("Pl.'s Resp.") at 1–2. The government's motion has been fully briefed and is ready for disposition.

## BACKGROUND[2]

### A. The Section 8 Housing Program

Section 8 of the United States Housing Act of 1937, codified as amended at 42 U.S.C. § 1437f, establishes a housing assistance program through which HUD is authorized to subsidize rent payments "[f]or the purpose of aiding low-income families in obtaining a decent place to live." 42 U.S.C. § 1437f(a); *see* Housing and Community Development Act of 1974, Pub.L. No. 93–383, 88 Stat. 633, 662–66 (1974) (adding Section 8 to the Housing Act). The statutory program permits HUD to enter into HAP Contracts with private building owners in which HUD agrees to pay rent subsidies on behalf of the low-income families living in the buildings' apartment units. *See* 42 U.S.C. § 1437f(b); *see also Brown Park Estates–Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1450–51 (Fed.Cir.1997) (explaining the statutory and regulatory scheme of the housing program), *Pennsauken Senior Towers Urban Renewal Assocs., LLC. v. United States*, 83 Fed.Cl. 623, 624 (2008) (reciting the background of the Section 8 program). HAP Contracts specify the maximum monthly rent ("contract rent") an owner may charge in leasing each unit, of which the tenant pays a particular amount based on his income and HUD pays the difference between the tenant payment and the contract rent. *See* 42 U.S.C. §§ 1437f(c)(1), 1437f(c)(3) (stating that HUD decides the

portion of rent payable by the family pursuant to Section 1437a(a)); *see also Brown Park*, 127 F.3d at 1451 (describing the allocation of rental payments). The initial contract rent is determined by HUD, taking into consideration the fair market value of the rental property and the additional costs attendant to implementing the requirements of Section 8. *See* 42 U.S.C. § 1437f(c)(1); *see also Brown Park*, 127 F.3d at 1451. The regulations permit the initial contract rent to be slightly above that charged by comparable unassisted units, but this "initial difference" must fall within a range of zero to twenty percent for HAP Contracts. *See* 42 U.S.C. § 1437f(c)(1).

"As originally enacted in 1974, the statute required HUD to adjust the maximum monthly rents on at least an annual basis." *Statesman II Apts., Inc. v. United States*, 66 Fed.Cl. 608, 610 (2005); *see Brown Park*, 127 F.3d at 1451 ("In addition to setting initial contract rents, HUD is responsible for adjusting the contract rents on at least an annual basis."). Accordingly, the HAP Contract was to

> provide for *adjustment annually or more frequently in the maximum monthly rents* for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula.

42 U.S.C. § 1437f(c)(2)(A) (emphasis added). HUD's obligation to adjust an owner's contract rents was incorporated into these agreements through a provision of the HAP Contract. *See, e.g., Statesman*, 66 Fed.Cl. at 610 (reciting Section 1.8(b) of the pertinent HAP Contract); HAP Contract § 1.8(b).[3] HUD was to increase the contract rents by applying an Automatic Annual Adjustment Factor ("AAAF") as published by HUD. *See Statesman*, 66 Fed.Cl. at 610; HAP Contract

---

**2.** The recitations that follow do not constitute findings of fact. Instead, the recited factual elements are taken from the parties' pleadings and filings and are undisputed except where a contrary indication is noted.

**3.** Generally, HAP Contracts were signed using standard forms, and the language of Section 1.8

was substantially similar among all HAP Contracts, although the numbering may be inconsistent. *See, e.g., Statesman*, 66 Fed.Cl. at 610 (reciting Section 1.8(b) of the pertinent HAP Contract), *Pennsauken*, 83 Fed.Cl. at 625 (quoting Section 2.7(b) of the relevant HAP Contract).

§ 1.8(b). However, HAP Contracts placed an "overall limitation" on the rent increases available to owners; adjustments were not to result in "material differences between the rents charged for assisted and comparable unassisted units," except where such differences existed in the initial contract rents. HAP Contract § 1.8(d). "In the early 1980[ ]s, HUD began to suspect that the assistance payments it was making to some landlords under the Section 8 program were well above prevailing market rates for comparable housing." *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 14, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993). HUD "began to conduct independent 'comparability studies' " in markets "where it believed that contract rents, adjusted upward by the automatic adjustment factors, were materially out of line with market rents." *Id.; see Statesman*, 66 Fed. Cl. at 611 (explaining the development of comparability studies). To produce these studies, "HUD personnel would select between three and five other apartment buildings they considered comparable to the Section 8 building and compare their rents." *Cisneros*, 508 U.S. at 14, 113 S.Ct. 1898. HUD then used the fair market rents determined by these studies to cap the maximum monthly rent charged by owners and, subsequently, to limit an owner's potential rent increases through the application of AAAFs. *See Statesman*, 66 Fed.Cl. at 611 (citing *Cisneros*, 508 U.S. at 14, 15, 113 S.Ct. 1898).

In 1994, amendments to Section 8 modified the process for adjusting contract rents. *See* Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1995, Pub.L. No. 103–327, 108 Stat. 2298, 2315 (1994) ("1994 Act") (amending 42 U.S.C. § 1437f(c)(2)(A)). Whereas prior to these amendments, HUD produced its own comparability studies and automatically increased an owner's contract rents where appropriate, the statutory modifications shifted the burden onto the owner to supply HUD with comparability studies that might support adjustments to contract rents. *See id.; see also Statesman*, 66 Fed.Cl. at 612 ("Congress further amended the statute to place on the owner the burden of disproving that the adjusted rent for its unit would exceed the rent for a comparable unassisted unit."); *Pennsauken*, 83 Fed.Cl. at 625 ("Congress shifted to owners the burden of proving that there would be no 'material difference' between the adjusted rent under a HAP Contract and the rent for a comparable unassisted unit."). If the contract rent to be adjusted by the pertinent AAAF would "exceed[ ] the fair market rental for an existing dwelling unit in the market area," the amended statute required the owner to demonstrate that the requested adjustment would not result in the contract rent exceeding the rent charged for comparable unassisted units "of similar quality, type, and age in the same market area." 42 U.S.C. § 1437f(c)(2)(A), as amended by 108 Stat. at 2315.[4]

To implement the recently enacted amendments and apply them to existing HAP Contracts, HUD issued Notice 95–12, on March 7, 1995. *See* Notice 95–12, Annual Adjustment Factor Rent Increase Requirements Pursuant to the Housing Appropriations Act of 1995, http://www.hud.gov/offices/adm/hudclips/ notices/hsg/files/95–12HSGN.doc ("HUD Notice 95–12") at 1. The Notice explained that if the owner's existing contract rents exceeded the fair market rents for that area as published by HUD, the owner was required to submit a form to HUD for approval to receive a rent increase. HUD Notice 95–12 at 3.[5] HUD mandated that the owner provide his or her own comparability study, reporting the rent levels of "at least

---

4. The 1994 amendments also required the AAAF to be reduced by one percent for any unit that was occupied by the same family at the time of the last annual adjustment. *See* 42 U.S.C. § 1437f(c)(2)(A), as amended by 108 Stat. at 2315.

5. If the owner's existing contract rent did not exceed the fair market rates, the owner did not need to submit comparability studies, but was required to provide HUD with the unit turnover rate since the last HAP Contract anniversary date. HUD Notice 95–12 at 7. If HUD did not receive the unit turnover rate information sixty days prior to the upcoming contract anniversary date, the adjustment would not occur on the anniversary date. *Id.* Once HUD received the required data, rental adjustments would occur sixty days thereafter. *Id.*

three examples of unassisted housing in the same market area of similar age, type, and quality." *Id.; see Pennsauken,* 83 Fed.Cl. at 626 (describing the effects of the 1994 amendments and Notice 95–12 on the owner's receipt of contract rent adjustments); *Statesman,* 66 Fed.Cl. at 612–13 (explaining the owner's obligations under the Notice). If the owner failed to submit this information "at least [sixty] days prior to the HAP contract anniversary date," rent levels would not be adjusted on the contract anniversary date. HUD Notice 95–12 at 3. However, once HUD received the necessary data and approved the increase, the new rent levels would take effect sixty days later. *Id.*

In evaluating the comparability studies submitted by an owner, HUD assessed the effect of an adjustment to the contract rent in relation to the rent of comparable unassisted units. HUD Notice 95–12 at 3. If after adjusting the owner's existing contract rent by applying the published AAAF the resulting rent level was less than that of comparable unassisted units, HUD would grant the rent increase. *Id.* If the resulting rent level was greater than the rent of comparable unassisted units, the owner would need to submit evidence of the initial difference that existed in the original contract rents, or HUD would need to identify the amount based on the documentation in its project file, "to assure that the initial difference which existed in the initial contract rents is protected." *Id.* at 3–4 (citing to a standard form HAP Contract § 1.8(d)). The initial difference percentage was added to the reported rents of comparable units, and this number became the "maximum permissible rent level allowed for each unit." *Id.* at 4. The owner's newly effective rent was the lesser of either the owner's existing contract rent as adjusted by the AAAF or the rent of comparable unassisted units as adjusted by the initial difference, unless adopting the lesser amount would result in a decrease in the current contract rent charged by the owner, in which case no adjustment would be made. *Id.*

### B. The Ocean View HAP Contract

Ocean View entered into a HAP Contract with HUD for the Ocean Pointe Towers Apartments project on September 3, 1980, under the terms of which HUD was to provide Ocean View with housing assistance payments for thirty years. Compl. ¶¶ 5–6. In exchange for leasing its apartment units to qualified tenants and complying with the regulations governing the Section 8 program, Ocean View was entitled to receive a specific contract rent for each unit. HAP Contract, Ex. A.[6] The housing assistance payments supplied by HUD were intended to compensate Ocean View for the difference between the contract rent called for under the HAP Contract and the amount of rent paid by each leasing family. *See* HAP Contract §§ 1.3(b)(1), 1.6(a)(1) (stating that HUD was obligated to make housing assistance payments to "cover the difference between the [c]ontract [r]ent and that portion of said rent payable by the [f]amily"); *see also* 42 U.S.C. § 1437f(c)(3).

Because the HAP Contract went into effect on September 3, 1980, the contract's future anniversary dates were September 3 of each subsequent year. *See* HAP Contract §§ 1.1(b), 1.4(b). The HAP Contract specified the initial contract rent for each unit at $470 per month. HAP Contract, Ex. A. On the date of execution, this initial contract rent was twenty percent higher than the fair market rent for comparable units, setting the initial difference of the HAP Contract at twenty percent. Compl. ¶ 7. Respecting adjustments to these rents, the HAP Contract provides in pertinent part that: "[o]n each anniversary date of the [c]ontract, the [c]ontract [r]ents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government." HAP Contract § 1.8(b)(2). HUD has published AAAFs each year since the HAP Contract went into effect. Compl. ¶ 9.

In the instant case, the contract rent for the 2002 contract anniversary year was $983 per unit, and the contract rent remained unchanged through the 2005 contract anni-

---

**6.** The HAP Contract specified that "[t]he Contract Units are to be leased by the Owner to eligible Lower–Income Families ('Families') for use and occupancy by such Families solely as private dwellings." HAP Contract § 1.3(a).

versary year. Compl. ¶ 18. The contract rent was subsequently increased to $989 for anniversary year 2006 and to $1033 for anniversary year 2008. *Id.* In "compliance with the express provisions of the Ocean View HAP Contract," Compl. ¶ 19, Ocean View avers that it appropriately requested contract rent adjustments for the contract years of 2002 through the date it filed its complaint and was entitled to receive increases in rents based upon the requested adjustments. Compl. ¶ 18. Ocean View claims that HUD failed to properly adjust the contract rents as required, and that this breach "has resulted in substantially lower housing assistance payments being made by HUD to Ocean View since HUD's first failure to adjust fully the [c]ontract [r]ent." *Id.* HUD has also allegedly "refuse[d] to make retroactive rent adjustments" for the period of January 23, 2003 through September 2, 2003 and for each subsequent year. Compl. ¶ 19.

## JURISDICTION

■ Ocean View invoked the jurisdiction of this court pursuant to the Tucker Act, 28 U.S.C. § 1491.[7] Section 2501 of Title 28 bars this court from entertaining any claim not filed "within six years after such claim first accrues." 28 U.S.C. § 2501. The Supreme Court has explained that it interprets 28 U.S.C. § 2501 as establishing a "more absolute" limitations period than many other statutes of limitations and thus has held that Section 2501 constrains this court's jurisdiction and that the limitations bar is not amenable to forfeiture or waiver. *John R. Sand & Gravel Co. v. United States,* 552 U.S. 130, ——, 128 S.Ct. 750, 753–54, 169 L.Ed.2d 591 (2008). Accordingly, this court lacks jurisdiction over any claims that occurred outside the applicable limitations period.

Because Ocean View filed its complaint on January 23, 2009, this court has jurisdiction over any claims that arose on or after January 23, 2003. Ocean View asserts damages resulting from HUD's failure to properly adjust the contract rent, which led to Ocean View's receipt of inadequate contract rent

payments for the period of January 23, 2003 to September 2, 2003 and for each subsequent anniversary year through the filing of its complaint. Compl. ¶ 20. The period of January 23, 2003 through September 2, 2003 falls within the 2002 contract year, which began on the contract anniversary date of September 3, 2002 and ended on September 2, 2003.

The disputed jurisdictional issue is whether the statute of limitations bars Ocean View's claims for adjusted rent payments from January 23, 2003 to September 2, 2003 because these payments relate back to an anniversary date that falls outside the six-year limitations period set forth in 28 U.S.C. § 2501. The government avers that HUD was obligated to adjust contract rents exclusively on an annual basis. Def.'s Mot. at 1, 5. As the government would have it, the statute of limitations for Ocean View's adjusted payment claims for the portion of the 2002 contract year from January 23, 2003 through September 2, 2003 would have expired September 3, 2008. *Id.* at 1. Thus, the government contends that because Ocean View's claims for the contested period accrued on September 3, 2002, and the six-year limitations period closed more than four months before the complaint was filed, these claims are barred by the statute of limitations. *Id.* at 1–2. Ocean View responds that the contract rents could be adjusted at any point during an anniversary year and that the claims for the contested period are not barred by Section 2501. Pl.'s Resp. at 1–2.

### A. Rent Adjustments Under the HAP Contract

The government and Ocean View differ both respecting the contents of the HAP Contract governing rent adjustments and the interpretation of the contractual provisions. The government contends that Section 1.8(b)(2) of the HAP Contract provides for the adjustment of contract rents " '[o]n each anniversary date of the Contract,' " such that these rates will continue in effect until the next anniversary date, imposing a duty on HUD to make rent adjustments *only* on the

---

7. The Tucker Act provides that this court has "jurisdiction to render judgment upon any claim against the United States founded ... upon any

express or implied contract with the United States." 28 U.S.C. § 1491(a).

contract anniversary date. Def.'s Mot. at 5–6 (quoting HAP Contract § 1.8(b)(2)). Ocean View by contrast invokes this court's reasoning in *Pennsauken,* in which the court concluded that the HAP Contract contemplated mid-year adjustments to HAP Contract rents, relying upon HUD's interpretation of its own regulations. *See* Pl.'s Resp. at 1–2 (discussing *Pennsauken,* 83 Fed.Cl. at 629).

### B. Applicability of 24 C.F.R. § 888.203

This case is essentially a reprise of *Pennsauken,* but with a distinction in the contractual language. In *Pennsauken,* plaintiffs filed a complaint on September 4, 2007 seeking "damages based on the alleged failure of HUD to provide automatic annual rent increases under the HAP Contract beginning in 2001." *Pennsauken,* 83 Fed.Cl. at 624. Accordingly, the six-year statute of limitations barred any claims that occurred before September 4, 2001. *See* 28 U.S.C. § 2501. Similarly to the instant case, the government moved to dismiss the portion of plaintiffs' claims that "reach[ed] back to the months before the anniversary of the contract occurring in March 2002," averring that the payments for September 2001 through March 2002 accrued on the contract's anniversary date of March 17, 2001, and thus, were barred by the applicable six-year statute of limitations. *Pennsauken,* 83 Fed.Cl. at 624. This court ruled for plaintiffs, giving effect to HUD's interpretation of its own regulations as described in Notice 95–12, which indicated that HUD contemplated "mid-year adjustments to contractual rents under HAP Contracts." *Id.* at 629.

The potentially significant distinction before the court in the instant case is that the HAP Contract in *Pennsauken* specifically incorporated 24 C.F.R. § 888.203, *see Pennsauken,* 83 Fed.Cl. at 625, and here, the HAP Contract with Ocean View does not expressly incorporate this provision. *See* Def.'s Mot. at 7–8. Section 888.203 explains that to determine the "adjusted monthly amount" of a contract rent, an owner must multiply the contract rent by the appropriate AAAF. 24

C.F.R. § 888.203(b).[8] In *Pennsauken,* plaintiffs interpreted the regulation's language of the "adjusted monthly amount" as suggesting that the AAAF calculation could occur monthly rather than strictly on a yearly basis. *Pennsauken,* 83 Fed.Cl. at 627. The government argued the position it asserts here: "that the specific reference to the anniversary date in the rent-adjustment provision of the [HAP] Contract indicates that an adjustment of the contract rent can take place on only that date." *Id.* The court found Section 888.203 and the HAP Contract provision ambiguous regarding "whether monthly rent adjustments can be made during an anniversary year or solely at the outset of such year." *Id.*

To resolve this "intractable ambiguity," the court looked to HUD's interpretation of its own regulations and concluded that Notice 95–12 "serves as a strong indication that the 'monthly amount' of a contract rent can be adjusted at times of the contract anniversary year other than on the anniversary date itself." *Pennsauken,* 83 Fed.Cl. at 629. Consequently, the court found that because "HUD advised that it could and would grant post-anniversary-date requests for rent adjustments," plaintiffs could claim rent adjustments for a portion of an anniversary year even after its anniversary date had passed. *Id.* Therefore, the court denied the government's motion to dismiss the claims it alleged fell outside the applicable statutory period, holding that the statute of limitations barred only those claims that actually accrued six years before the complaint was filed and did not prevent recovery for the entire contract anniversary year. *See id.*

In the instant case, the dispositive issue is whether the absence of specific reference to 24 C.F.R. § 888.203 in the Ocean View HAP Contract dictates a different result. The contested provision of the HAP Contract, Section 1.8(b)(2), provides that "[o]n each anniversary date of the [c]ontract, the [c]ontract [r]ents shall be adjusted by applying the applicable Automatic Annual Adjustment

---

**8.** The language of 24 C.F.R. § 888.203 has not been substantially altered since its first publication in 1977. *See, e.g.,* 24 C.F.R. § 888.203 (1977); 24 C.F.R. § 888.203 (1979). The slight modifications to the regulation over the years are unrelated to the issues currently pending before this court.

Factor as published by the Government." HAP Contract § 1.8(b)(2). Section 888.203 states that "[t]he adjusted *monthly* amount of the [c]ontract [r]ent of a dwelling unit shall be determined by multiplying the [c]ontract [r]ent in effect on the anniversary date of the contract by the applicable Automatic Annual Adjustment Factor." 24 C.F.R. § 888.203(b) (emphasis added). The government would distinguish the Ocean View HAP Contract provision from that in *Pennsauken,* arguing that the "language of the [HAP] Contract in this case is significantly different; there is no ambiguity in the relevant provision of the [c]ontract" because of the absence of a specific reference to 24 C.F.R. § 888.203. Def.'s Mot. at 7–8.

Ocean View contends that "it is of no consequence that the Ocean View HAP Contract does not specifically incorporate or mention [Section 888.203]." Pl.'s Resp. at 3. It argues that the pertinent section of the Code of Federal Regulations was in existence at the time the contract was made, and "[t]hose regulations still apply" because applicable statutes and regulations are considered to be incorporated into agreements even without explicit reference. *Id.* at 2–3 (citing *Dart Advantage Warehousing, Inc. v. United States,* 52 Fed.Cl. 694, 700 (2002)). If Section 888.203 is considered part of the HAP Contract, then the same ambiguity that led the court to look to Notice 95–12 in *Pennsauken,* whether adjustments can occur more often than annually, would also be present here.

 It is well settled legal principle that "[l]aws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms." *Norfolk & W. Ry. v. American Train Dispatchers Ass'n,* 499 U.S. 117, 130, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) (citing *Farmers & Merchants Bank of Monroe v. Federal Reserve Bank of Richmond,* 262 U.S. 649, 660, 43 S.Ct. 651, 67 L.Ed. 1157 (1923)); *see also Eastern Bldg. Corp. v. United States,* 96 Ct.Cl. 399, 405 (1942) (finding that a statutory provision "was as much a part of the lease as if it had been written therein and formed

a part of the contractual relations of the parties"). Further, "parties contract with knowledge of the law." *Dart Advantage Warehousing,* 52 Fed.Cl. at 700 (citing *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384–85, 68 S.Ct. 1, 92 L.Ed. 10 (1947) ("Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents.")). Hence, although a contract lacks specific inclusion of a pertinent statute or regulation, contracting parties are nonetheless " 'presumed to be aware of applicable statutes and to intend to incorporate them.' " *Id.* (quoting 24 Corbin on Contracts § 24.26, at 273 (1998)). Consequently, failure specifically to incorporate a statute or regulation in a contract has no bearing on the statute's or regulation's applicability to that contract because "the law becomes a part of the contemporaneous circumstances of the contract's execution and is incorporated, without reference, into the agreement itself." *Id.* Section 888.203 is therefore a part of the Ocean View HAP Contract regardless of whether the parties' written agreement contains an explicit reference to the provision. The absence of Section 888.203 in the HAP Contract neither alters the analysis from that of *Pennsauken,* nor precludes the application of this provision to the parties' contractual agreement. As such, this court must resolve the ambiguity posed by Section 888.203 and the HAP Contract provision regarding the timing of contract rent adjustments.

 "This dispute over interpretation of contractual and regulatory language in essence turns on the administrative procedures that HUD has actually been following in the course of settling disputes over HAP Contract rents." *Pennsauken,* 83 Fed.Cl. at 627–28. The principle that "an agency's interpretation of its own regulations is 'controlling' unless 'plainly erroneous or inconsistent with' the regulations being interpreted" is self-evident. *Long Island Care at Home, Ltd. v. Coke,* 551 U.S. 158, 170, 127 S.Ct. 2339, 168 L.Ed.2d 54 (2007) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)); *see*

also *American Contractors Indem. Co. v. United States*, 570 F.3d 1373, 1376–77 (Fed. Cir.2009) (giving effect to an agency regulation bearing on a securities-bond guarantee agreement). Thus, this court must look to HUD's interpretation of its regulations to ascertain whether contract rent adjustments can occur more frequently than solely on an annual basis.

### C. HUD Notice 95–12

■ As stated previously, HUD issued Notice 95–12 to clarify the process owners must follow when requesting rent increases by adjustment through AAAFs. HUD Notice 95–12 at 2. The Notice "addressed the question whether the adjustment of contract rents occurs strictly on an annual basis, or whether such adjustments can be made at any date during the anniversary year." *Pennsauken*, 83 Fed.Cl. at 628. Notice 95–12 was "[t]o [a]ffect all applicable contracts with HAP anniversary dates from the date of issuance to the end of Federal FY 1995 (through September 30, 1995)," HUD Notice 95–12 at 1, which includes the Ocean View HAP Contract anniversary date of September 3. Since the issuance of Notice 95–12, HUD has applied the HAP Contract rental adjustment provision in accordance with the specifications described by the Notice. *See Pennsauken*, 83 Fed.Cl. at 628 ("In practice, since March 1995, HUD has applied the annual rent adjustment provision in HAP Contracts based upon the regimen set forth in Notice 95–12.").[9] Its provisions specify that if an owner's current contract rent is above the published fair market rents of comparable unassisted units, the owner must submit comparability studies in order to receive a rent increase. HUD Notice 95–12 at 3. "If the owner fails to submit the information required by this Notice at least [sixty] days before the contract anniversary date, then the rent levels will not be adjusted on the contract anniversary date, rather the new rent levels will go into effect [sixty] days after receipt of the required information."

*Id.* According to this explanation, if an owner wishes for the adjustment to become effective on the contract anniversary date, the owner must provide HUD with comparability studies sixty days prior to that date. If the owner has not submitted the required information by the sixty-day deadline, the owner may nonetheless receive a rent increase, but it will not occur on the contract anniversary date; the rent adjustment will go into effect sixty days after HUD's receipt of the studies. HUD Notice 95–12 at 3. This interpretation in the Notice finds support in the statute, as amended by the 1994 Act, which states that HAP Contracts were to provide for "adjustment *annually or more frequently in the maximum monthly rents* for units covered by the contract." 42 U.S.C. § 1437f(c)(2)(A) (emphasis added). Thus, an owner's ability to obtain a rent increase is not foreclosed once the contract anniversary date has passed; HUD can provide mid-year adjustments or even mid-month adjustments so long as the owner has submitted the requisite comparability studies.

It follows that because Notice 95–12 indicates that contract rents can be adjusted at times other than the contract anniversary date and because the interpretation in the Notice comports with the statutory text, HUD was not limited to providing Ocean View with rent increases solely on the contract anniversary date of September 3, 2002. In short, HUD could have granted rent increases for the remaining portion of the 2002 contract year after the contract anniversary date of that year had passed. The court consequently rejects the government's argument and rules that Ocean View's claims against HUD resulting from its failure to provide rent increases during the period from January 23, 2003 to September 2, 2003 are not barred by the applicable statute of limitations.

### CONCLUSION

The government's motion to dismiss Ocean View's claims for the period from January 23,

9. Although Notice 95–12 expired on September 30, 1995, its provisions were made permanent by subsequent notices issued by HUD. *See Park Props. Assocs., L.P. v. United States*, 82 Fed.Cl. 162, 166–67 (2008) (listing examples of the notices HUD published extending the provisions of Notice 95–12); *Statesman*, 66 Fed.Cl. at 613 n. 6 ("HUD reinstated and extended the terms of Notice 95–12 through subsequent notices.") (citing the notices).

2003 through September 2, 2003 is DE-NIED. The parties shall file a joint status report on or before August 19, 2009, setting out a proposed plan and schedule for future proceedings to reach a resolution of Ocean View's claims.

It is so ORDERED.